Commonwealth *v.* Peterman, Appellant.

Argued November 24, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Robert N. C. Nix, Jr.*, for appellant.

*William Stevens, Jr.*, Assistant District Attorney, with him *Alan J. Davis*, Assistant District Attorney, *Richard A. Sprague*, First Assistant District Attorney, and *Arlen Specter*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, August 6, 1968:

This matter comes before us on a direct appeal from a judgment of sentence imposed on Waverly Peterman following his conviction by a jury of voluntary manslaughter.

On January 21, 1966, Peterman was the night manager of the "Roberts Bar" located in Philadelphia. On that date, at approximately 9:30 p.m., one Samuel Barron, a bar patron, was shot and killed by Peterman, the bullet having been fired at a range of 6 to 8 inches. Peterman was indicted for murder and manslaughter,

convicted of voluntary manslaughter and, upon refusal of motions for a new trial and in arrest of judgment, sentenced to a prison term of not less than 3 nor more than 10 years.

In presenting its case at trial, the Commonwealth relied principally upon the testimony of two witnesses whose versions of the incident were conflicting. Arthur Fleming, a bartender at "Roberts Bar", testified that Barron with others entered the barroom and, after some period of time had elapsed, he engaged in an argument with Fleming concerning the amount of change due him; that Barron created a disturbance and Peterman, after some effort, momentarily quieted Barron; later, as Barron and Peterman were standing on the patron's side of the bar with Peterman wedged between the bar stools, Barron appeared to be reaching for a gun and Peterman then instructed Fleming to give him a gun; that Fleming took a pistol from behind the bar and placed it within Peterman's reach; while Fleming's attention was directed elsewhere, he heard a shot but he did not actually see the shooting. Thomas Bates testified that he and Barron, prior to their arrival at "Roberts Bar", had purchased and consumed a bottle of gin; that they arrived at the bar between 6:45 and 7:00 p.m.; that, after he and Barron had consumed some beer, an argument arose between Peterman and Barron concerning a girl; that, prior to the shooting, Peterman knocked Barron to the floor, and as he was getting up said to him "M. F. I told you I would kill you sooner or later."; that, although Fleming had twice refused Peterman a gun, Fleming finally placed a pistol on the bar within Peterman's reach; that he, Bates, remonstrated with Peterman saying "You don't need the pistol. You already won the fight with the fellow"; that he saw the actual shooting; that Peterman, holding Barron by the back of the neck, pointed the pistol at him and discharged it.

Other Commonwealth testimony was as follows: Mrs. Barron, the victim's wife, testified that about 9:50 p.m., she arrived at the "Roberts Bar" and the only persons present at that time were Fleming, Peterman and Bates and her husband who was then lying on the floor groaning; a Mr. Williams, manager of the corporation which owned "Roberts Bar", stated that Peterman, after the shooting, had telephoned him and said "I didn't intend to shoot this man, it was an accident", that he and the victim had had a struggle and the victim had knocked the gun out of Peterman's hand causing it to discharge accidentally. Several police officers testified as to circumstances subsequent to but collateral to the shooting. A medical examiner testified that the cause of death was a gunshot wound at close range, the bullet travelling upward at a 30° angle, and that, at the time, Barron was in a state of acute alcoholism.

Peterman's argument falls into three categories: (1) that the trial court erred in its charge to the jury in that: (a) it summarized, from its own notes, Bates' testimony after the jury had requested additional instructions *unrelated to Bates' testimony*; (b) in not fairly presenting the positions of *both* Peterman and the Commonwealth; (c) in charging on the necessity that the verdict be unanimous; (2) that the trial court erred in several trial rulings; (a) in permitting a prior consonant statement of Bates to be received in evidence; (b) in refusing to sequester Barron's widow and (c) in ruling that Peterman's prior criminal record could be considered by the jury to show a likelihood that he had committed the offense charged; (3) that the trial court erred in not directing a verdict of acquittal for Peterman.

After the jury had deliberated for several hours, the trial court was notified that the jury desired to have the complete testimony of the Commonwealth's wit-

ness Fleming read to them.[1]  After Fleming's testimony had been read, the trial court, *sua sponte,* summarized from its own notes the testimony of the Commonwealth's witness Bates.  Peterman contends such summarization constituted error because (a) it unduly emphasized Bates' testimony and (b) the recitation of such *unsolicited* testimony was prejudicial.

This proposition is somewhat novel in this Commonwealth.  Prior reported cases have dealt with the question whether a trial court had abused its discretion in agreeing to or refusing to give additional instructions as to the law or to have read back certain portions of the testimony *when requested to do so by the jury.*  See: *Cunningham v. Patton,* 6 Pa. 355 (1847); *Commonwealth v. Smith,* 221 Pa. 552, 70 A. 850 (1908); *Commonwealth v. Bolger,* 42 Pa. Superior Ct. 115 (1910); *Commonwealth v. Brown,* 264 Pa. 85, 107 A. 676 (1919); *Commonwealth v. Fontaine,* supra.

A trial court's duty is to insure that the jury is fully and adequately instructed as to the law applicable to the facts of the case and, when a trial court refuses a jury request for additional instructions, such refusal is reversible error.  See: *Commonwealth v. Smith,* supra.  But where a jury, in order to refresh their recollection, requests a reading of a portion of the testimony actually given at the trial, it is a matter within the discretion of the trial court whether to grant such request.  If the trial court does grant the request, the review of testimony must be conducted in open court in the presence of parties and their counsel and, if the resultant review does not place undue

---

[1] Peterman's counsel concedes that the granting of this request rested within the discretion of the trial court (*Commonwealth v. Fontaine,* 183 Pa. Superior Ct. 45, 128 A. 2d 131 (1956); *McPeek v. Shafer,* 120 Pa. Superior Ct. 425, 183 A. 80 (1936)) and that the trial court in permitting such testimony to be read did not abuse its discretion.

emphasis on one witness' testimony, no reversible error is committed. See: *Commonwealth v. Bolger*, supra. However, if the trial court, at the request of the jury, *sends out* to the jury the testimony of any certain witness such would constitute reversible error. See: *Commonwealth v. Ware*, 137 Pa. 465, 20 A. 806 (1890).[2] The proper procedure is for a jury to address its request to the trial judge and, if, in the exercise of the court's discretion, a review of testimony is allowed, such review must be conducted before the court, the parties and counsel.

In *Henry v. United States*, 204 F. 2d 817, 820, 821 (1953) it was said: "After the jury has reported its inability to agree upon a verdict, it is, in our opinion, incumbent upon the trial judge to exercise extreme care in reopening the case for the introduction of further testimony or in permitting any evidence to be restated or re-read to the jurors. Unless restraint is exercised by the judge, it may well be that he would permit undue emphasis to be placed upon portions of the testimony, *if such portions were called for by the jurors.*" (Emphasis added).

The purpose of any requested review of testimony, obviously, is to dispel any confusion or uncertainty present in the minds of the jurors as to the actual testimony they heard during the course of the trial. As was said in *Commonwealth v. Fontaine*, supra (at p. 47) : "Although under our system of jurisprudence the jury is the ultimate trier of facts, it does not follow that in all instances and at all times men and women called for jury duty are endowed with infallible powers of retention. Juries may not take notes on the progress of testimony and not infrequently they may retire with confused recollection of the evidence. Par-

---

[2] See Annotation in 50 A.L.R. 2d 176 et seq. concerning the right to have reporter's notes read to jury.

ticularly may this human failing present itself in lengthy trials involving many complex issues of fact. *When, therefore, such admission is frankly disclosed,* the trial court must have discretion in determining how best to resolve the confusion or misapprehension of facts in the minds of the jury. This discretion is an incident to the mode and manner of trial and, in the absence of flagrant abuse, should rest with the trial court." (Emphasis added). In the matter of reviewing testimony, it is the jury's request which is the basis upon which a reading back of the reporter's notes or a transcription of them may be justified. To go beyond the limits of such request is to enter an area where the personal feelings of the trial judge may be subtly interjected into the proceedings by emphasizing only that testimony which is either favorable or unfavorable to one of the parties. Such, in our view, was the inadvertent result in the present case.

After having permitted the *jury-requested* reading of Fleming's testimony as transcribed, the trial court, *sua sponte,* then stated to the jury: ". . . you have heard the precise transcript of the testimony of Mr. Fleming, both on direct and cross-examination . . . . It is my custom in the course of a trial such as this to make my own hand notes. You can see that I have many pages of hand made notes. I take what seems to be pertinent. What I took down is what occurred to [me] to be pertinent . . . . So I'm not purporting to give you a precise transcript of what Mr. Bates said as Mrs. Montgomery (court stenographer) just did, because that would take us so long to transcribe."

The court then proceeded to summarize, from his own handwritten notes, *his* recollection of what seemed pertinent in Bates' testimony. The following portion of the record indicates that the trial court, unintentionally, did place undue emphasis on certain aspects of Bates' testimony: "[On cross-examination] various

discrepancies were brought out between Bates' testimony in court before the jury and the testimony before the magistrate.

"One, as to the time they arrived at the bar; two, as to whether they were drinking beer or wine; three, as to whether the argument was over a girl or over the change from a five dollar or a ten dollar bill; four, about actually seeing the gun; five, about seeing the actual shooting.

"There were several other slight discrepancies, but I will leave it to your recollection."

The court then reminded the jury of a statement given by Bates to the police the day after the shooting, portions of which statement had been read at the trial by a Detective Lee, which statement, according to the trial court, "was substantially the same as the testimony given in [court by Bates]". However, our study of this record indicates that Bates' version of the slaying given in his statement to the police, although similar *in some respects,* was not *substantially* the same as Bates' testimony at trial and the discrepancies between his testimony at trial and his testimony at the magistrate's hearing, in our view, were not "slight".

In his statement to the police, Bates said: "A. [Peterman] said, 'M.F., I told you I was going to kill you sooner or later.' Sam,[the victim] put his right hand in his right front pocket. *Sam stood up* and [Peterman] said 'Don't put your hands in your pocket.' Sam said, 'I don't have anything in my pocket'. [Peterman] came and pulled Sam toward him and, as he pulled him, he shot the gun and everybody ran out.

"*I jumped on the phone* and called the police. While I was on the phone [Peterman] put the gun upon the bar . . . ." (Emphasis added).

At trial, Bates testified that he was standing at the telephone dialing the police *prior to the shooting* and the following took place:

"Rat, [the bartender] said 'I won't give you no pistol', or something like that. [Peterman] said, 'Rat, give me the pistol.' By that time *Sam was getting up. I was on the telephone,* [Peterman] said again 'Give me that pistol', like that, so Rat said, 'I'm not going to give you no pistol.' [Peterman] said 'give me the pistol'. *Sam got up,* and [Peterman] said 'I told you I'm going to kill you sooner or later.' . . . Q. And then what took place? A. Then, *as Sam was getting up,* Rat took the pistol and throwed it on the bar, and [Peterman] grabbed the pistol. He grabbed Sam behind the head *while I was talking on the telephone and he fired.*" (Emphasis added).

There are obvious differences between the two versions: (1) did Bates go to the telephone and call the police before or after the shooting, and, thus, what was his location in the barroom at the time of the incident? (2) did Barron reach for something in his right front pocket as he was getting up, and did Peterman say "Don't put your hand in your pocket", (the version given in the statement)? (3) did Peterman say "M.F., I told you I was going to kill you" before or after Barron got up? (4) did Barron reach in his pocket *before* Peterman got the gun from the bartender? (5) was Barron on his feet when shot, facing Peterman and exchanging words, or was he getting up from the floor? (6) did Peterman grab Barron behind the head and shoot him as he was getting up or did he grab him as they stood facing one another, exchanging insults and threats, and did the gun go off in the ensuing struggle?

The two versions appear so unlike as to create the impression they were given by two different persons and the statement given to the police was *not* consonant with Bates' testimony at trial. On the witness stand, Bates first denied making a statement to the

police, then admitted doing so but gave no explanation for his denial.

On cross-examination, Bates was confronted with his testimony given at a magistrate's hearing. At that hearing, *Bates flatly denied having seen the actual shooting* and his version of the events leading up to the final struggle was markedly different from that given in open court. Unfortunately, the trial court failed to point out with sufficient clarity the nature and extent of these *serious discrepancies* in its summary of Bates' testimony at the time the jury returned with its request to have read to it Fleming's testimony.

Because of the serious inconsistencies between these versions of the crime, it was palpable error to *summarize* Bates' testimony from handwritten notes and we believe this error was compounded when the court told the jury that Bates' statement given to the police and his testimony in open court were *substantially the same*. Moreover, the court neglected to review for the jury Bates' testimony given on cross-examination, concerning that which he said at the magistrate's hearing.

The effect of the summary of Bates' testimony was to place undue emphasis on the portions of Bates' testimony most damaging to Peterman and, as a result, Peterman's theory of self-defense was undermined by the court and the Commonwealth's theory of an intentional homicide was unduly stressed.

For this reason, we are of the opinion that Peterman is entitled to a new trial.

However, because this case must be retried, we deem it necessary to consider several other questions raised on this appeal which must be resolved before the retrial takes place.

If Bates' statement to the police qualified as a prior consonant statement, that statement would be admissible in rebuttal to bolster Bates' credibility since evi-

dence was admitted tending to show that Bates' testimony was a recent fabrication. The latter evidence was introduced on cross-examination by the introduction of certain testimony Bates had given at a magistrate's hearing and such attack on Bates' credibility would warrant the admission of a prior consonant statement: *Commonwealth v. Vento,* 410 Pa. 350, 189 A. 2d 161 (1963). As we noted before, the difficulty is that Bates' statement given to the police differed in so many essential aspects from his trial testimony that it cannot be deemed as an admissible prior *consonant* statement. The damaging effect of the admission of this statement was heightened when the trial court told the jury during its spontaneous summary of Bates' testimony that the statement *was* "substantially the same as the testimony given in [court by Bates]."

Two further points, germane to the retrial, remain for discussion.

In the first place, it was not error for the trial court to instruct the jury that its verdict must "reflect the unanimous vote of all of you." See: *Commonwealth v. Patrick,* 416 Pa. 437, 206 A. 2d 295 (1965); *Commonwealth v. Ford,* 193 Pa. Superior Ct. 588, 165 A. 2d 113 (1960). The effect of such instruction was simply to inform the jury that their verdict could not be rendered by a majority vote but only by a unanimity of opinion. This charge, read in its proper context, would not lead a juror to believe that he had no right to express his independent view in the event that he was in disagreement with his fellow jurors. Lacking unanimity, the jury could not have returned *any* verdict and would have had to be dismissed.

In the second place, a question has been raised regarding the effect of a so-called "ruling" *in chambers* by the court prior to the time the defense opened. In chambers, the court stated that, if Peterman were to take the stand, his prior criminal record would be ad-

missible not only to attack his credibility, but to demonstrate a likelihood that he had committed the crime for which he was then being tried. The following colloquy took place in chambers:

"(The Court). . . . It is the Court's understanding, from the statement of the District Attorney, in the event the defendant takes the stand, it would be his intention to prove the prior crime of robbery by appropriate evidence, other than cross-examination.

"The Court rules, therefore, that the crime of robbery by the present defendant in 1959 could be proved in, but could not be used to impeach the defendant.

"The Court rules the robbery is a crime of violence, the taking of property or larceny by force of some sort, and *it is the opinion of the trial judge that this prior conviction would be definitely germane in a case of homicide of first degree,* and other forcible crimes of second degree murder or involuntary manslaughter were involved. Therefore, the court would permit such evidence until and unless the District Attorney endeavors to elicit this by cross-examination or in some manner that would be an improper method, and then the Court will not.

"Mr. Nix: (defense counsel) I take exception to both rules, particularly the last ruling, in that the Court has suggested the fact that the robbery would be *germane as to the alleged commission of the instant crime.*

"The Court: *It is a matter (of) argument to the jury* rather than being conclusive.

"Mr. Nix: The Court's ruling now is that you would allow the District Attorney to argue the relationship between the crime in 1959, that *because of his conviction of that crime, he might be guilty of this crime; is that correct?*

"The Court: *The answer is, speaking in general terms, yes.* The Court should say that he is making

this ruling out of a matter of courtesy to the defense counsel, to enable him to make the difficult decision in a capital case as to whether or not he wishes to put on a defense. Ordinarily, the Court would not rule preliminarily because this, in effect, constitutes an advisory opinion . . . ." (Emphasis added).[3]

Because of this judicial statement, defense counsel submit that they elected not to place Peterman on the stand to testify in his own defense, and were thus deprived of their best defense witness in advancing the self-defense theory.

If the court had restricted its declaratory ruling to the point that Peterman's prior criminal record could be introduced for the *limited* purpose of impeaching his credibility if he took the stand, then the court would have been correct. Act of 1911, March 15, P. L. 20, §1, 19 P.S. 711; *Commonwealth v. Butler,* 405 Pa. 36, 46, 47, 173 A. 2d 468 (1961). However, the rule is different where evidence of prior conviction is introduced to show a criminal disposition or the likelihood defendant committed the crime whereof he is being tried: "As a general rule, at common law, on a prosecution for a particular crime, a distinct crime unconnected with that laid in the indictment cannot be given in evidence against a prisoner as substantive proof of the crime for which he is being tried. Nor can evidence of such crime be received to impeach general character, or to prove a normal disposition to commit the crime for which the accused is on trial. . . . At common law generally, prior convictions of certain crimes in the nature of crimen falsi could be used as evidence to effect credibility, either through cross-examination or by the testimony of other witnesses." *Common-*

---

[3] The court did say it could make no definite ruling until it knew the facts of the 1959 robbery and the District Attorney said he did not intend to introduce prior convictions other than to attack credibility.

*wealth v. Williams*, 307 Pa. 134, 147, 148, 149, 160 A. 602 (1932).

In the case at bar, this issue, raised prior to the presentation of the case for the defense, was not the possible impeachment of Peterman's credibility if he took the witness stand, but the introduction of evidence of a prior conviction as "germane"[4] to the crime for which Peterman was being tried. The court, although it made no definite ruling, certainly indicated that it *might* permit the introduction of Peterman's prior record to show a likelihood he committed the crime for which he was being tried. The expression of the court's view on this issue gave defense counsel no more than a Hobson's choice; either keep the defendant off the stand or take the chance the court would allow the Commonwealth to show the prior conviction and then permit argument to the jury that such conviction shows a disposition to commit the crime for which he is being tried. This was *no* choice.

If Peterman had taken the witness stand and given evidence then, *solely for the purpose of impeaching his credibility as a witness,* his record of prior conviction would have been admissible by way of rebuttal testimony. The Act of 1911, supra; *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287 (1952).

However, the trial court, even though in chambers, clearly intimated that, in the event Peterman took the stand, the Commonwealth could introduce the conviction of a prior crime, *since* "this prior conviction would be definitely germane in a case of homicide of first degree . . . ." Anglo-American Law has for centuries protected those accused of crime from the evils of such a doctrine. See: Wigmore on Evidence, 3rd Edition, Vol. 1, Book 1, §57, pp. 454-456, §§193-194

---

[4] "Germane" means relevant to or closely allied; i.e., that a conviction for robbery in 1959 was relevant to or closely allied to the commission of a homicide in 1966.

(a), (b), (c), pp. 642-663. The rationale of this rule was well stated in *Dennison v. State*, 17 Ala. App. 674, 88 So. 211 (1921). "The evidence introduced over the defendant's objection relating to other offenses than that charged in the indictment no doubt alarmed the suspicion of the jury, or at least it may have had that effect, and inclined them the more readily to believe in the guilt of the defendant of the offense charged, and rendered the jury less inclined to listen or give proper weight and consideration to whatever was offered in his defense . . ., they will very naturally believe that a person is guilty of the offense with which he is charged if it is proved to their satisfaction that he has committed a similar offense . . . ."

Defense counsel's strategy in the instant case could not help but have been influenced by the trial court's declaratory ruling made in chambers. Not having heard Peterman on the stand relate his story on which he based his self-defense theory, the jury was deprived of an opportunity to make a rational appraisal of all versions of the sequence of events leading up to the shooting. We can well understand that the failure of Peterman to take the stand could well have been motivated by the implication of the trial court that he would allow the introduction of the prior conviction for unrestricted purposes. The trial court should not have permitted this implication to arise. Unfortunately, the implication was given, the defense trial strategy may well have been fashioned thereby and Peterman was withheld from the stand. Such error must not occur on the retrial of this matter.

Lastly, it is urged that the trial court should have directed a verdict of acquittal. Our reading of this record convinces us that the guilt or innocence of Peterman clearly was a question of fact for the jury to resolve and the court could not properly have directed a verdict of acquittal.

642

Judgment reversed and a new trial granted.
Mr. Justice ROBERTS concurs in the result.
Mr. Chief Justice BELL dissents.