UNITED STATES of America,
Appellee,

v.

Joseph GENTILE and Ernest LaPonzi-
na, Defendants-Appellants.

Nos. 260, 261, Dockets 75–1248, 75–1249.

United States Court of Appeals,
Second Circuit.

Argued Sept. 19, 1975.

Decided Oct. 22, 1975.

Certiorari Denied March 29, 1976.
See 96 S.Ct. 1493.

Irwin Klein, New York City, for defendants-appellants.

Kirby Patterson, Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., Eastern District of New York, and Sidney M. Glazer, Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

Joseph Gentile and Ernest LaPonzina appeal from convictions after a jury trial in the District Court for the Eastern District of New York. Gentile was convicted on two counts of offering a bribe of $3,000 and giving such a bribe to I.R.S. Special Agent Nicholas Tsotsos on June 14 and 15, 1972, respectively, in violation of 18 U.S.C. § 201(b). Both appellants were convicted on a count of offering a bribe of $1,000 and free golf lessons and giving such a bribe to Tsotsos between June 14 and August 9, 1972, also in violation of 18 U.S.C. § 201(b). Both appel-lants were convicted of conspiring to give the latter bribe, in violation of 18 U.S.C. § 371. Appellants' legal contentions can be understood without a detailed statement of the facts.

## I.

The most serious contention is one raised and raisable solely by LaPonzina. Initially the judge had granted LaPonzina's motion for severance. Then, at his request, the ruling was reversed. Later he changed his mind again, but the judge refused a second request for severance.

After a jury had been selected, the prosecutor, Mr. Barlow, made an extended opening. Evidently thinking that some explanation of this was needed, he told the jury that they had heard the judge talk about a possible defense of entrapment; that they were going to hear a lot of argument about it; and that, as triers of the fact, under instructions from the judge on the law, they would have to decide whether Gentile and LaPonzina were forced into committing a crime or whether Agent Tsotsos merely afforded them an opportunity. Therefore, when hearing agent Tsotsos and particularly when listening to tapes of various conversations, they should attend "very, very carefully to the words that are used, the phrasing that is being used, the inflections of the people's voices . . . ."

The judge then inquired whether Gentile's attorney, Mr. Schettino, wished to open. Schettino asked permission to approach the sidebar. He objected to the prosecutor's having anticipated the defense of entrapment. The court agreed that the prosecutor "should not have made that statement." The prosecutor answered that the entrapment defense had been raised by preliminary motion of a previous counsel on behalf of Gentile and had been referred to in the voir dire of the jurors. Mr. Klein, attorney for LaPonzina, entered the fray in support of the argument that the opening had been improper, since "[y]our main case is only what you are supposed to tell

them." The judge said that the argument "raises a problem. I do not know how serious it is. It may not be serious at all." After a further intervention by Mr. Klein, urging the impropriety of the opening, the judge declared a recess. When he returned, he excused the jury and told counsel that he thought the prosecutor's remark might prove prejudicial if in fact no entrapment defense was offered. He asked for briefs both on the question of prejudice and on the issue whether declaration of a mistrial "would involve a double jeopardy situation," adding that he thought it would not.

After an adjournment, without awaiting the briefs, the judge addressed counsel as follows:

I have given it a lot of thought as to the problem that faced the Court this morning as to the opening statement made as to the question of the defendants having a defense of entrapment and whether or not it would prejudice the jury. And I have also given a lot of thought, without having briefs, as to the motion made for a mistrial.

The motion—is it being made by both defendants for a mistrial?

Mr. Klein: Mr. Schettino made the motion.

The Court: I want to know if you are making it too?

Mr. Klein: May I consult with my client for a moment, your Honor?

(Pause.)

Mr. Klein: Your Honor, I spoke to Mr. LaPonzina and we feel that the question of entrapment really affects Mr. Gentile and it is not our motion to make.

The Court: That's not the reason why I asked it, Mr. Klein. You know the reason I asked whether or not you join in the motion of the defendant Gentile for a mistrial, so that I have the consent of both the defendants to select a new jury tomorrow morning.

Mr. Klein: I do not join in the motion. I do not think it is mine to join in or not.

Normally you say you will go along with your brother attorney but Mr. LaPonzina is in a different position from Mr. Gentile.

The Court: Then if you do not join in the motion, you are part of the argument of the motion that the statement made by the prosecutor as to a defense of entrapment to the jury is prejudicial. You did join in the original motion.

Mr. Klein: I participated in it.

The Court: Since you participated in it, the Court would have the right to assume that you were joining in the motion.

It is this Court's opinion at this time that the better way to proceed would be to select a new jury rather than go through a ten-week trial and have this as one of the issues on appeal, where that could be cured immediately.

Secondly, it cannot be cured merely by asking the jury to disregard it, since a motion has been made for a mistrial and no double jeopardy would attach, we can start with a clean slate. The jury can be selected tomorrow morning.

A further discussion ensued. Gentile's counsel claimed that the granting of his motion for a mistrial would prevent a new prosecution under principles of double jeopardy. After the judge had dismissed this contention on the ground of consent by Gentile's counsel, the following colloquy took place:

Mr. Klein: On behalf of the defendant LaPonzina I do not join in the motion. I did not consent.

The Court: You discussed the motion this morning as to entrapment and I will take it as a consent that this jury should not hear the case—an implied consent.

As long as you want to play with me, I will do it my way. It is an implied consent on your part and a motion by the defendant that there would be prejudice to both defendants,

because they are both involved in the same manner and on the same tapes.

Mr. Klein: May I add for the record that my participation in the argument was in assistance of Mr. Schettino's argument and certainly not intended as a consent by Mr. LaPonzina.

The Court: You represent your client and you represent him for all purposes. You cannot separate the discuss[ion] on one part from another.

After further discussion, the court delivered an oral opinion explaining why in its view the declaration of a mistrial would not prohibit a new trial of both defendants. Mr. Klein again endeavored to disassociate himself from the motion for a mistrial, saying that LaPonzina "really does not have a defense of entrapment," that his remarks in support of the motion for a mistrial had been made in the discharge of his "duty as an officer of the Court, where I can shed some light on the subject, to volunteer," and that he had thereafter apprised the court that he did not join in the motion. After telling Mr. Klein to "take a look at the minutes," the court denied his motion to dismiss the indictment against LaPonzina. A new trial began the next morning and resulted in the convictions here under appeal.

This case is another illustration of the wisdom of Mr. Justice Story's statement in the seminal case of *United States v. Perez,* 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824), that "it is impossible to define all the circumstances which would render it proper" for the trial court to abort a criminal trial without giving rise to a defense of double jeopardy, and Mr. Justice Black's remark in *Wade v. Hunter,* 336 U.S. 684, 690, 69 S.Ct. 834, 93 L.Ed. 974 (1949), concerning the impossibility of laying down a "rigid formula" on the subject. While LaPonzina's counsel may not have consented to the declaration of a mistrial, he had heavily contributed to it. His intervention at the initial conference at sidebar had served

to stimulate the judge's concern. Nothing in his remarks at sidebar indicated that the prosecutor's reference to both defendants in regard of an entrapment defense would prejudice only Gentile; indeed, if LaPonzina had no entrapment defense, as Mr. Klein later said, the opening was more prejudicial to him than to Gentile, not less. If counsel felt it to be his duty as an officer of the court to "shed some light on the subject," the light should have included then, not later, an indication that LaPonzina did not regard the remark as prejudicial to him and wanted his trial to proceed, failing which he would claim double jeopardy. If the judge had realized from the start that compliance with the request of Gentile's counsel would require separate trials that would otherwise be quite needless or would create a serious double jeopardy claim by LaPonzina, he might well have given more consideration to the course, not pressed by anyone, that admonishing the jury to disregard this part of the prosecutor's opening would suffice.[1] By the time LaPonzina's counsel made his position clear, the addition of his initial remarks to those of Gentile's counsel had led the judge to become convinced that the prosecutor's error had been far more serious than it had first seemed to be.

Quite apart from the action of LaPonzina's counsel in helping to lead the judge to the precipice, LaPonzina's double jeopardy claim must fail under the principle of *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961). In that case, which came to the Supreme Court from this court, the trial judge aborted the trial of his own motion during the examination of the fourth witness for the Government, apparently because he "inferred that the prosecuting attorney's line of questioning presaged inquiry calculated to inform the jury of other crimes by the accused, and took action to forestall it." 367 U.S. at 366, 81 S.Ct. at 1525. Although we thought the judge had been

1. In fact Gentile relied heavily on the entrapment defense at the "second" trial; indeed, the judge gave an entrapment charge as to both defendants without objection.

"overzealous" and had acted "too hastily," 282 F.2d 43, 46, 48 (2 Cir. 1960), we rejected a double jeopardy claim on the basis that the action of the trial judge was within his discretion and was the product of what the Supreme Court characterized as his "extreme solicitude—an overeager solicitude, it may be—in favor of the accused." 367 U.S. at 367, 81 S.Ct. at 1525. Giving meaning to the famous phrase "manifest necessity" in *United States v. Perez, supra,* 9 Wheat. at 580, Mr. Justice Frankfurter said, 367 U.S. at 368, 81 S.Ct. at 1526:

> Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.

He added, 367 U.S. at 369–70, 81 S.Ct. at 1526–1527:

> Judicial wisdom counsels against anticipating hypothetical situations in which the discretion of the trial judge may be abused and so call for the safeguard of the Fifth Amendment— cases in which the defendant would be harassed by successive, oppressive prosecutions, or in which a judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused. Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial. It would hark back to the formalistic artificialities of seventeenth century criminal procedure so to confine our federal trial courts by compelling them to navigate a narrow com-

pass between Scylla and Charybdis. We would not thus make them unduly hesitant conscientiously to exercise their most sensitive judgment—according to their own lights in the immediate exigencies of trial—for the more effective protection of the criminal accused.

Our case seems *a fortiori* to *Gori* in three respects: the prosecutor's opening was arguably more prejudicial to the defendants than the questions in *Gori,* although not deliberately so; the defendants had argued that it was prejudicial; and the declaration of a mistrial came before any testimony had been taken.[2]

LaPonzina relies heavily on Mr. Justice Harlan's plurality opinion in *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). The judge in that case had aborted the trial not in the interest of the defendants but in that of witnesses who he thought had not been adequately informed of their constitutional rights. Mr. Justice Harlan reiterated the *Gori* holding, 400 U.S. at 482, 91 S.Ct. 547, explained that in *Jorn* "the judge's insistence on stopping the trial . . . was motivated by the desire to protect the witnesses rather than the defendant," 400 U.S. at 483, 91 S.Ct. at 556, rejected as a speculation the Government's argument that in fact the judge's action had benefited the defendants, and stated the Court's inability "to conclude on this record that this is a case of a mistrial made 'in the sole interest of the defendant,'" citing *Gori.*

If the opinion had stopped at that point, there would be no basis for arguing that it undercut *Gori,* in which Justice Harlan had joined. However, he went on to say "that a limitation on the abuse-of-discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provi-

---

**2.** We do not, of course, mean by this last clause that defendants had not yet been placed in jeopardy. The point is rather that in weighing the harm to the defendant incident to a new trial against the desirability of the court's protecting a defendant from prejudice (and retrial after a possibly successful appeal), even without an application on his part, the length of his exposure at the first trial is a relevant consideration.

sion." 400 U.S. at 483, 91 S.Ct. at 556. As we read the further discussion, 400 U.S. at 483–87, 91 S.Ct. 547, particularly as illumined by Mr. Justice Stewart's dissent, 400 U.S. at 490–91, 91 S.Ct. 547, Mr. Justice Harlan was laying down in dictum a *per se* rule that when the aborting of a criminal trial was an abuse of discretion, a double jeopardy defense would prevail even if the judge's sole intention was to benefit the defendant.[3]

The Court returned to the subject in *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). There the declaration of a mistrial was triggered not by matters arising in the examination of witnesses as in *Gori* and *Jorn,* but by the discovery, after the jury was impaneled, that the indictment was invalid. Although *Somerville* clearly would have preferred to go to trial on the invalid indictment since under Illinois law the defect was uncorrectible, the Court rejected a double jeopardy claim. It reaffirmed "[t]he broad discretion reserved to the trial judge" to abort a criminal trial without subjecting a defendant to double jeopardy forbidden by the Constitution, 410 U.S. at 462, 93 S.Ct. at 1069. It quoted with approval the statement in *Gori,* 367 U.S. at 368, 81 S.Ct. 1523, which we have reproduced above. *Jorn* was distinguished, 410 U.S. at 466, 93 S.Ct. 1066, on the basis that, as had there been stated, the trial judge in that case "made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial," 410 U.S. at 466, 93 S.Ct. at 1071.

Although reconciliation of *Gori* and *Somerville,* in which the double jeopardy claim was rejected, with *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), and *Jorn,* where it was sustained, has posed some difficulties for the commentators, see Kamisar, LaFave & Israel, Modern Criminal Procedure 1442 note 3 (1974)—not to speak of the numerous and vociferous dissents of the Justices [4]—we have little doubt that principles recognized in all these cases dictate affirmance even if we were to disregard the role played by LaPonzina's counsel and still more clearly when we take this into account. The facts are indistinguishable from *Gori,* and even if we take that decision as having been qualified by *Jorn* in a manner not wholly eradicated by *Somerville,* this case falls within the *Gori-Jorn* composite standard of lack of abuse of discretion in declaring a mistrial because of an inadvertent error of the prosecutor and benefit to the defendant as the sole motivation. *See United States v. Spinella,* 506 F.2d 426, 431 (5 Cir. 1975) (Wisdom, *J.*), *cert. denied,* —— U.S. ——, 96 S.Ct. 227, 46 L.Ed.2d 147 (1975). How far a double jeopardy defense may be precluded in other situations, such as that in *Somerville,* is not here before us.

Review of the transcript convinces us that the judge had been persuaded by defense counsel that the prosecutor, although unwittingly, had subjected the defendants to serious prejudice by suggesting they would not contest the acts charged by the Government but would defend themselves on the ground of entrapment. In declaring a mistrial he not

---

**3.** Mr. Justice Stewart, speaking also for Justices White and Blackmun, thought "[t]he real question" to be "whether there has been an 'abuse' of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime." 400 U.S. at 492, 91 S.Ct. at 560.

There may be circumstances when a double jeopardy defense should prevail even though the declaration of a mistrial was not an abuse of discretion, e. g., when a prosecutor, sensing that things are not going well, deliberately makes a highly inflammatory remark.

**4.** All four decisions were rendered by divided courts, with unusually sharp dissents. Mr. Justice Stewart, speaking for three dissenters in *Jorn,* thought that it was "both overbroad and flatly inconsistent with this Court's decision in *Gori v. United States,*" 400 U.S. at 491, 91 S.Ct. at 560. Mr. Justice Marshall, dissenting in *Somerville,* thought the majority "substantially eviscerates the rationale" of *Jorn* and *Downum.* 410 U.S. at 477, 93 S.Ct. 1066.

only was acting "in the sole interest of the defendant[s]," *Gori,* 367 U.S. at 369, 81 S.Ct. at 1527, but within the permissible bounds of discretion. On any view of the colloquy at least one defendant had asked for a mistrial; where no evidence has been presented and no delay will ensue, we do not think a trial judge must take one horn or the other of the dilemma of refusing to recognize what he considers a valid claim of prejudice or granting a severance in order to forfend a successful claim of double jeopardy. See *Scott v. United States,* 91 U.S.App. D.C. 232, 202 F.2d 354, 355, *cert. denied,* 344 U.S. 879, 73 S.Ct. 196, 97 L.Ed. 681 (1952). It is immaterial that, in the exercise of appellate hindsight, we may not regard the prejudice as so great or so incurable by less drastic means.

This analysis does not run contrary to *United States v. Glover,* 506 F.2d 291 (2 Cir. 1974). In *Glover* we upheld a claim of double jeopardy where, after several days of a multi-defendant trial, the court granted a Government motion to sever Glover, which had been made as a result of a ruling that a statement that the Government wished to introduce against Glover could not be admitted, under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because of its prejudicial effect on co-defendants. *Glover* was a very different case. Exclusion of the statement was not mandated to protect Glover's interest; rather it was to safeguard the interests of his co-defendants. The Government should not have allowed the trial to proceed without a severance if its case against Glover depended on a statement inadmissible because of its prejudicial effect on other defendants. As Judge Gurfein pointed out, 506 F.2d at 298, the inadmissible statement was the functional equivalent of the missing witness in *Downum v. United States, supra,* 372 U.S. at 735, 83 S.Ct. 1033, if the trial had proceeded after the exclusionary ruling, Glover stood a far better chance of acquittal than in the subsequent separate trial in which the statement was admitted. Here it is sheer speculation that LaPonzina would have fared better at the hands of the first jury, which had heard the prejudicial statement of the prosecutor, than with the second, which had not.

## II.

The prosecutor's case was based on the conversations between Special Agent Tsotsos and the defendants, to which Tsotsos testified, and tapes of which were introduced into evidence. At his first meeting with Gentile, Tsotsos informed Gentile of some of his legal rights, but not of his right to have counsel present; at the first meeting with LaPonzina, even skimpier information was provided. Tsotsos thus appears to have failed to follow the procedures stipulated for special agents in IRS News Release No. 897, issued October 3, 1967, and News Release No. 979, issued November 26, 1968;[5] the government does not argue otherwise.

At a pre-trial hearing, Mr. Klein moved "to suppress any conversation Tsotsos had with the defendant LaPonzina"; the district court denied the motion on the ground that the IRS directives were merely "a guide to their own employees by an administrative agency." At trial, defense counsel did not object when Tsotsos testified to his conversations with their clients. Rather, on cross-examination they sought to bring out that Tsotsos had not followed IRS procedure for conducting a criminal investigation; apparently their purpose was to strengthen their claim that the defendants had been entrapped into bribery. However, following Tsotsos' testimony and again at the close of the evidence, Mr. Klein moved to have the evidence suppressed, to no avail. The defense also requested that the jury be charged that they could suppress the statements if they found that these would not have been given but for the Agent's failures to warn. The trial

---

5. The press releases are substantially reproduced in *United States v. Leonard,* 524 F.2d 1076, 1088 (2 Cir. 1975).

judge indicated that he would give a charge referring to the regulations only in regard of the defense of entrapment, which he did do to some extent.[6]

Appellants now claim error, both in the failure of the trial judge to suppress the statements, and in his failure to charge the jury that they might do so. However, here, as in *United States v. Leonard,* 524 F.2d 1076, 1088–1090 (2 Cir. 1975), we are not obliged to determine whether we would follow the lead of other circuits which have held that violation of the News Releases mandates the exclusion of incriminating statements. *United States v. Heffner,* 420 F.2d 809 (4 Cir. 1969); *United States v. Leahey,* 434 F.2d 7 (1 Cir. 1970); *United States v. Sourapas,* 515 F.2d 295 (9 Cir. 1975). Even if we were to adopt that rule, suppression would not be warranted in this case.

■ The purpose behind the stipulation by the IRS of these procedures for special agents was to extend the protection of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to criminal tax investigations conducted in a noncustodial setting. *United States v. Leahey, supra,* 434 F.2d at 8. A failure to give *Miranda* warnings, however, even in a custodial setting, would not prevent a prosecution for an attempt to bribe a law enforcement officer made subsequent to the arrest. *United States v. Perdiz,* 256 F.Supp. 805 (S.D.N.Y.1966); cf. *Vinyard v. United States,* 335 F.2d 176, 181–83 (8 Cir.), *cert. denied,* 379 U.S. 930, 85 S.Ct. 327, 13 L.Ed.2d 342 (1964); *United States v. Soles,* 482 F.2d 105, 108 n.4 (2 Cir.), *cert. denied,* 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973). We doubt also that it should prevent proof of the crime of bribery by showing the required intent through statements that would be excludable under *Miranda* if used to prove the crime to which the statements relate.[7] Exclusion of statements offered for the former purpose would seem an unnecessary extension of *Miranda* even in cases of custodial interrogation; the basic purpose of *Miranda,* to prevent abusive police interrogation of persons not aware of their right to remain silent, hardly extends to tax evaders whose quick reaction is to offer to bribe the investigating officer and are then prosecuted for doing so. It seems even more unlikely that the IRS intended its News Releases to bar a Special Agent from telling the full story of an attempt to bribe him simply because he had failed to give the specified warnings.

■ However, we are not obliged to resolve even that issue in this case. The defendants made no effort to differentiate the statements, either at the appellate level or, more importantly, at trial. Since the effect of the IRS News Releases was presented to the judge as an all-or-nothing matter, including exclusion of bribe offers, we do not think he was required to separate out the statements concerning the tax case which were the most that were even arguably excludable. Since there was no warrant for suppression of all the statements by the judge, he certainly was not obliged to instruct the jury that they might suppress some or all of the incriminating conversations—a dubious procedure on any view.

### III.

■ While the jury was deliberating, it sent a note to the judge stating:

We must confess that this would not have contributed greatly to our understanding had we been on the jury.

---

6. The Court charged:

   You have heard that agent Tsotsos, in violation of an administrative regulation of the Internal Revenue Service, failed to advise the defendants of their rights at his initial meeting with each defendant. You must treat this information like any other piece of evidence, that is, you must determine the weight to be given this testimony.

7. The district judge ruled, as a matter of relevance, that statements relating to "the tax matter will not be offered to the jury on the basis of the tax case but rather goes toward the intent of bribery and not for tax purposes."

We would like to hear the playing of the tape connected with *count three*. Referring to $1000 and Golf Lessons.

Confusion began with a remark of the clerk:

Note on the tapes, they want to hear the tapes in reference to Count Three as to one thousand dollars and the golf lessons. I understand on two different tapes.

The prosecutor joined in:

Yes, your Honor. A thousand dollars mentioned twice on the tape of August 3rd and we have it on the machine. The golf lessons mentioned on August 8.

Mr. Klein, representing LaPonzina, pointed out that the note said "tape" not "tapes."

Instead of taking a few minutes in an endeavor to work out the problem with counsel, the judge said:

Mr. Klein, when it gets to this stage, I run the court with the jury. I will ask them when they come out, I will conduct it and I will do everything. I take no suggestions and I'm telling you something. I just don't want to argue with you and I take no suggestions as to what I shall do with this jury at this stage of the proceeding.

From here on, your case is finished. It's now up to the Court what it does with the jury.

The jury was brought in and the judge asked whether they wanted to hear the tape "connected with Count Three referring to one thousand dollars and golf lessons." The foreman first answered "Yes." Then, in response to a renewed inquiry, he said, "We want to know about the thousand dollars." Later the foreman seemed to specify the tape of August 8 or 9; the former, in addition to having language that could be construed to be an indirect reference to the $1,000 was the only tape that referred to the golf lessons.

At the instance of the prosecutor, the playing began with the tape of August 3. When Mr. Klein objected that this was not what the jury asked for, the judge again silenced him and instructed the jury to advise if what was being played was not what it wanted. After more objections and discussion, the judge again told the jury to point out if what they were hearing was not what they wished. The jury heard the August 3 tape without objection on its part, and, after some further colloquy, the August 8 tape. Later, in response to a further request, the August 9 tape was played.

Assuming that the jury requested to hear only the August 8 and 9 tapes—and on this record it is hard to be sure exactly what the jury did want—appellants argue that playing the August 3 tape violated a principle that "in the absence of a request, the judge is not free to send material in to the jury *sua sponte*." The Government's brief makes no real response, except for a suggestion that the point was sufficiently met by the judge's telling the jury that if it had any objection to hearing the August 3 tape, it could say so.

■ If the legal norm were as demanding as appellants contend and the Government seems to concede, we doubt that it could be satisfied that easily. Apart from the problems how far the foreman might feel that he could speak for a jury sitting in open court, whether any other juror would feel free to do so, and what would happen if the jurors disagreed, jurors may be reluctant to tell a judge they do not want to hear something that was being played for or read to them at his direction even if, as here, he had made abundantly clear that they could. The legal principle, however, is not so unyielding. It is well stated in the ABA Standards Relating to the Administration of Criminal Justice, Trial by Jury § 5.2(b) (1968):

The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to

ite error

give undue prominence to the evidence requested.

In *United States v. Tager,* 481 F.2d 97, 101 (10 Cir. 1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974), and *State v. Miller,* 2 Or.App. 353, 467 P.2d 683, 684–85 (1970), trial courts which insisted that a jury hear all of a witness' testimony, rather than the partial segment the jury had requested, were affirmed on appeal. In *Commonwealth v. Peterman,* 430 Pa. 627, 244 A.2d 723 (1968), where the jury asked for the testimony of one witness and the trial judge in addition summarized for them the testimony of another, reversal was based not on the ground that going beyond the jury's request was *per se* impermissible, but rather on the facts that the trial judge had summarized the testimony rather than having it read back; that in so doing he had misstated it; and that the effect of misstating "was to place undue emphasis on the portions of [a witness'] testimony most damaging to Peterman . . . and the Commonwealth's theory . . . was unduly stressed." 244 A.2d at 728–29. In our own *United States v. McCarthy,* 473 F.2d 300 (2 Cir. 1972), we refused to reverse where, as part of a general claim that the trial judge had unduly interfered with the proceedings, the defendants pressed the point that he had allowed the entire testimony of a witness to be read back even after the forelady had said that the jury had heard enough. We found that the judge had not "in any way prejudiced any of appellants or displayed the slightest bias toward them" but rather had exercised his discretion "as to how much of a witness' testimony should be read back to the jury in the interest of fairness and completeness." 473 F.2d at 308. In other words, reversal for submitting material in addition to that requested is required only where the submission might indicate, or be fairly taken by the jury to indicate, prejudice of the judge against the defendant, as, e. g., when the judge insisted on submitting evidence favorable to the prosecution that was in no way germane to

the request, or when it leads to a biasing of the record.

If the judge had decided in the exercise of his discretion that playing the August 3 tape was necessary or desirable to enable the jury to understand the tapes of August 8 and 9, there would thus have been no case for reversal. The subject matter of the August 3 tape was closely related to that of the August 8 and 9 tapes, for which the jury had asked; consequently the jury could not have thought that the additional playing of the August 3 tape indicated any prejudice by the judge; and there is no claim of incorrectness. Such difficulty as exists comes from the failure of the trial judge to follow the instructions in *United States v. Schor,* 418 F.2d 26, 31 (2 Cir. 1969), that when a jury's request for testimony is not clear "the judge should consult with counsel for both sides to see if there is disagreement as to what should be submitted to the jury." Here the judge simply dismissed counsel's objection and relied on letting the jury do the job he should have performed. Conceivably discussion with counsel might have led to a withholding of the August 3 tape even though it would have been permissible to play it whether or not requested. But, viewing the case as a whole, we do not think this an appropriate situation for reversing because of a failure to exercise discretion when what was done did not fall outside permissible bounds, 28 U.S.C. § 2106.

## IV.

■ LaPonzina claims that the evidence showed merely that he knew that Gentile offered and paid a bribe on his behalf, and that he was entitled to an acquittal under *United States v. Stromberg,* 268 F.2d 256 (2 Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). As we read the testimony, there was sufficient evidence to carry the case to the jury, which decided this contention adversely to the defendant.

Defendants' other contentions do not merit discussion.

Affirmed.