UNITED STATES of America,
Plaintiff-Appellee,

v.

Melvin MEREDITH, a/k/a Monk,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gregory PARKER, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Nathaniel HICKS, Jr., a/k/a Bubbles,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Rubin PARKER, a/k/a Eddie Bo,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Audie FRISBY,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Avon DOCKINS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Steve GARLAND, Defendant-Appellant.

Nos. 86–5061 to 86–5068.

United States Court of Appeals,
Fourth Circuit.

Argued April 8, 1987.

Decided Aug. 4, 1987.

Francis Samuel Brocato (Brocato & Keel-ty, on brief), Allen Martin Lenchek, Wash-ington, D.C., Arthur Michael Frank, Balti-more, Md. (Gerald M. Richman, Columbia,

Md., Myles R. Eisenstein, Robert T. Durkin, Jr., Steven A. Wilder, Baltimore, Md., on brief), for defendants-appellants.

Harvey Ellis Eisenberg, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before PHILLIPS, ERVIN, and CHAPMAN, Circuit Judges.

ERVIN, Circuit Judge:

This is a consolidated appeal from the convictions of seven defendants involved in a heroin ring in Baltimore. Defendants were convicted of conspiring to distribute heroin and other related offenses. On appeal, they raise several procedural and substantive issues. Because we find no reversible error below, we affirm the convictions of these defendants.

## I.

The present case involves the activities of a Baltimore heroin ring from 1983 to October 30, 1985. This is not the first time we have encountered this Baltimore drug ring. In September, 1982, a special narcotics grand jury returned a thirteen-count indictment against fifteen defendants, including ringleader Clarence Meredith.[1] After a jury trial, eight of those defendants were convicted of various narcotics offenses. We reversed their convictions on procedural grounds. *See United States v. Ricks*, 776 F.2d 455 (4th Cir.1985), *rev'd on reh'g*, 802 F.2d 731, *cert. denied*, — U.S. ——, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986). Prior to the indictment in *Ricks*, Clarence became a fugitive from justice and remained so until his arrest on October 30, 1985. During his period as a fugitive, Clarence regrouped the vestiges of his drug ring and added new members to it, creating the group involved in the instant appeal.

As ringleader, Clarence was assisted by defendants-appellants Rubin Parker, Gregory Parker, Nathaniel Hicks, Jr., Avon Dockins, and Melvin Meredith, Clarence's brother. Two other Meredith brothers, Andrew and Lawrence, helped Clarence and Rubin cut, package, and distribute "raw" (uncut) and street-quality heroin. Clarence maintained a "stash house" in Cockeysville, Maryland, for the storage and cutting of heroin prior to its distribution. His brother Andrew often acted as a liaison, delivering the heroin from the stash house for sale to Melvin and other ring members.

Through Rubin's recruitment of "street distribution lieutenants," Clarence expanded his territory in the Baltimore area. These lieutenants included Hicks and James "Scotty" Wiggins. The lieutenants supervised the sale of heroin in their particular territories. Clarence held regularly scheduled meetings with his street lieutenants. At these meetings, heroin was distributed to the lieutenants for further distribution, and the lieutenants turned over money they had collected for previously distributed heroin. Lawrence or Andrew ran the meetings, either with Clarence or alone. The meetings almost always took place on Wednesday or Saturday evenings.

The first arrest relevant to this case occurred on July 15, 1985, when officers of the Baltimore City Police Department apprehended Wiggins. At the time of his arrest, Wiggins had in his possession 396 bags of street-quality heroin. After Wiggins agreed to cooperate with law enforcement authorities in capturing members of the drug ring, he was sent back into the ring to obtain large quantities of heroin for redistribution. Wiggins wore a recording device so that he could monitor the drug group's activities.

On July 20, 1985, Wiggins met with Hicks and defendant-appellant Charles Frisby, who had attended some of the ring's meetings. The three men gathered in anticipation of a scheduled meeting which never occurred. While they waited for the other ring members, Wiggins, Hicks, and Frisby discussed the drug group's activities. Wiggins recorded this conversation, which was the basis for Frisby's conviction.

---

1. For the sake of clarity, when two or more individuals share a surname, we refer to them by their first names.

Through Wiggins, law enforcement authorities also monitored a ring meeting on October 26, 1985. At that meeting, it was established that Wiggins, Gregory, Parker, and Dockins were the only members who still had some heroin available for sale. The leaders arranged another meeting for October 30, 1985, for the purpose of supplying the lieutenants with more heroin.

At the October 30 meeting, Clarence and members of his group were arrested. After the arrest, several members, including Andrew and Lawrence Meredith, pleaded guilty and agreed to cooperate with the government. Andrew and Lawrence provided the government with information leading to a search of the Cockeysville stash house and the seizure of narcotics debt sheets. These sheets reflected narcotics distribution activities involving Hicks, Wiggins, Dockins, Gregory Parker, and others. Law enforcement authorities also seized various items used in the cutting of heroin.

Andrew and Lawrence supplied the government with information which implicated defendant-appellant Steve Garland in the drug conspiracy. Andrew indicated that he had obtained large quantities of glassine bags and mannitol (a material used with quinine as a cutting agent for heroin) from Modern Music House, a record shop which Garland and his parents owned. Andrew bought these items from Garland in increasing quantities as Clarence's drug operations grew. Andrew and Lawrence Meredith established that other ring members had made similar purchases from Garland. Pursuant to search warrants executed on December 11 and 16, 1985, large quantities of quinine hydrochloride, mannite, and glassine bags were seized from Modern Music House.

On November 1, 1985, a grand jury for the District of Maryland returned a single-count conspiracy indictment against the seven defendants involved in this appeal, along with sixteen co-defendants. On December 20, 1985, a superseding indictment was returned. In Count 2 of this indictment, the seven defendants in this appeal, Melvin Meredith, Rubin Parker, Gregory Parker, Avon Dockins, Nathaniel Hicks, Jr., Charles Frisby, and Steve Garland [collectively called "the ring members" or "defendants"], were charged with conspiring to distribute heroin, in violation of 21 U.S.C. § 846 (1982). Additional counts charged all of the defendants except Garland with knowingly and intentionally possessing heroin with the intent to distribute and with distributing heroin on specific dates, in violation of 21 U.S.C. § 841(a) (1982).

The jury trial in the United States District Court for the District of Maryland began on February 24, 1986. At the close of the government's case-in-chief, counsel for the defendants moved for a judgment of acquittal. The court granted this motion only as to one of the distribution counts against Melvin Meredith. On March 12, 1986, the jury returned a guilty verdict on all the remaining counts. Each defendant timely noted his appeal.

The ring members raise numerous procedural and substantive errors in the proceedings below. Some of these alleged errors relate to Count 2, the conspiracy charge against all seven defendants; others relate to charges against individual defendants. We review the attacks on the conspiracy convictions first, then take up the issues concerning the separate charges.

## II.

The ring members urge a reversal of their conspiracy convictions on two procedural grounds, both relating to the jury selection process. They argue that the trial court erred in failing to provide them with additional peremptory challenges and in determining that there was substantial compliance with the Jury Selection and Service Act. Neither of these contentions has any merit.

The award of peremptory challenges in a criminal case is governed by Rule 24(b) of the Federal Rules of Criminal Procedure. That rule reads, in pertinent part:

If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or de-

fendants jointly to 10 peremptory challenges.... If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.

Prior to voir dire in this case, the trial judge proposed giving each defendant an additional challenge, conditioned upon the government receiving three additional challenges. Defendants' attorneys, however, would not stipulate to this arrangement. They pointed out that the trial judge had announced, in chambers, that he would give the defendants unconditional extra challenges. The trial judge acknowledged this, but asked defense counsel how the defendants would be prejudiced if he decided not to allow these extra challenges. Defense counsel did not offer any convincing responses.[2]

The trial court ultimately awarded the government six peremptory challenges and the seven defendants ten peremptory challenges, to be exercised jointly. The judge also provided that, if a defendant contended that he was prejudiced by an inability to exercise additional challenges, the judge would examine the merits of that contention in camera and then decide whether or not to allow the defendant additional peremptory challenges. The trial judge subsequently allowed defendants one additional peremptory challenge to strike a prospective juror who had a hearing impairment.

■■■ Rule 24(b) gives the trial court discretion in granting or denying additional peremptory challenges beyond the ten mandatory challenges. The court's discretion is indicated by the permissive language of the rule ("the court may allow") and by the cases construing that language. *See, e.g.,* *United States v. Harris,* 542 F.2d 1283, 1294 (7th Cir.1976). The ring members acknowledge this principle, but claim that the trial court abused its discretion in refusing to award additional challenges. The grant of ten peremptory challenges for seven de-

fendants meant that each defendant could exercise less than one and a half challenges. This low ratio allegedly denied each individual defendant his role in the jury selection.

This argument, based upon the ratio of challenges to defendants, is undercut by the very cases upon which the defendants-appellants rely. *See, e.g., United States v. Harris, supra; United States v. Mayes,* 512 F.2d 637 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). In *Harris* and *Mayes,* the final ratio of challenges to defendants was even lower than the 10:7 ratio in this case. In *Harris,* the ratio was 17:12; in *Mayes,* the ratio was 24:24. Neither case found this ratio to be an abuse of the trial judge's discretion.

The ring members also rely on our language in *Ricks,* in which we found that the trial court's failure to give clear, unambiguous instructions about the procedures for exercising peremptory challenges in that case constituted reversible error. *See Ricks,* 776 F.2d at 462, n. 9. The ring members argue that the trial judge committed reversible error by indicating that he would give extra challenges in chambers, then refusing to do so. The ring members' reliance on *Ricks* is misplaced. In that case, we addressed the impairment of the right to mandatory peremptory challenges, rather than the additional, discretionary challenges at issue here. The distinction between the two types of challenges is a fundamental one. *See United States v. Hueftle,* 687 F.2d 1305, 1309 (10th Cir.1982) ("the 'impairment' of the right to peremptory challenges refers to denial of the mandatory challenges, not whether more should be given").

In this case, the trial judge acted within his discretion in denying each defendant additional challenges beyond the ten prescribed by Fed.R.Crim.P. 24(b). The judge offered defense counsel the opportunity to explain why additional challenges were nec-

---

**2.** Defense counsel articulated several unpersuasive reasons why the denial of additional challenges would be prejudicial. Melvin's attorney argued that extra peremptory challenges are mandatory in multi-defendant cases, a proposition that the Supreme Court rejected long ago. *See Stilson v. United States,* 250 U.S. 583, 585–86, 40 S.Ct. 28, 29, 63 L.Ed. 1154 (1919).

essary. The judge did allow the defendants an additional challenge in striking the prospective juror with a hearing impairment.

The ring members also contend that the trial court erred in determining that selection of the jury panel was in substantial compliance with the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. §§ 1861 *et seq.* (1982) ("the Act"). Section 1867 of the Act allows a defendant, before voir dire, to move for a dismissal of the indictment or a stay of the proceedings against him on the basis of substantial failure to comply with the Act's rules for jury selection. Subsection 1867(d) provides that, if the trial court finds a substantial failure to comply with the Act in selection of the jury, the court shall stay the proceedings pending a proper jury selection. The ring members argue that a substantial failure to comply with the Act occurred in this case, and that the trial court acted improperly in refusing to stay the proceedings upon the defendants' request.

The ring members' argument concerns the prospective jurors' past service. The trial judge found that every member of the array had been a member of an earlier array and had not been selected to sit on a case. Defendants claim that the fact that their array consisted of "reject jurors" constituted "substantial failure" to comply with the terms of the Act.

■ The ring members made a similar argument to the trial court. The court questioned the jury administrator and chief deputy clerk as to the selection process; both of these officials stated under oath that the panel was not chosen in any way that deviated from the jury plan for the District of Maryland, which is in compliance with the Act. *See United States v. Blair,* 493 F.Supp. 398, 403 (D.Md.1980), *aff'd,* 665 F.2d 500 (4th Cir.1981).[3]

■ Defendants have not established a violation of the Act. The fact that the array members were passed over for service on previous juries does not amount to substantial noncompliance with the Act. Mere technical deviations do not constitute substantial noncompliance with the Act. *See United States v. Davis,* 546 F.2d 583, 589 (5th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). In their brief, defendants rely upon cases finding substantial noncompliance which are clearly distinguishable from the present situation. *See, e.g., United States v. Branscome,* 682 F.2d 484, 485 (4th Cir.1982) (substantial noncompliance existed when clerk asked for volunteer grand jurors); *United States v. Okiyama,* 521 F.2d 601, 603–04 (9th Cir.1975) (inclusion of non-English-speaking jurors violated specific provisions of the Act). This case most closely resembles *United States v. Davis,* 456 F.2d 1192, 1196 (10th Cir.1972), in which the United States Court of Appeals for the Tenth Circuit rejected defendant's argument that an array consisting of "leftovers" from another trial violated the Act.

### III.

In addition to challenging the jury selection process, four of the defendants, Melvin Meredith, Rubin Parker, Frisby, and Garland, attack their convictions on independent grounds. As discussed below, we find none of these attacks convincing.

### A. *Melvin Meredith*

Melvin Meredith was charged with knowingly and intentionally distributing heroin in June, 1983 (Count 26), May, 1984 (Count 37), and June, 1984 (Count 38), in violation of 21 U.S.C. § 841(a) (1982). Melvin was convicted on each count. In challenging his conviction, Melvin argues that the trial court erred in rereading, for the jury's benefit, certain testimony that was preju-

---

**3.** When the court asked defendants for a specific showing of noncompliance with the Act, defendants stated only that the number of blacks on the jury panel was disproportionately low. The court properly found this fact insufficient to support a challenge to the array. The trial judge emphasized that defendants were not enti-

tled to a specific statistical balance in the jury panel, but only to a jury chosen at random from a representative pool; the administrator and deputy clerk established that the random selection procedure prescribed in the district had been followed.

dicial to him. During its deliberations, the jury sent the trial judge a note asking for a complete transcript of Andrew Meredith's trial testimony. The judge explained that there was not enough time to prepare a full transcript. The jury then narrowed its request to cover only Andrew's testimony about the distribution of raw heroin in June, 1984.

The court reread part of Andrew's testimony to the jury. This included Andrew's statement, on cross-examination, that he delivered a "thousand quarters" (or bags of heroin) to Melvin in April or May, 1984, at a certain location, before making his summer delivery of raw heroin to Melvin at the same location. Melvin's attorney objected to the rereading of this testimony. He claimed that Andrew's statement constituted evidence of Melvin's other crimes which the jury did not specifically request. Defense counsel moved for a mistrial, but the trial court denied the motion. The court found that the challenged testimony related to Andrew's delivery of raw heroin to Melvin, since it placed that delivery in context of the brothers' drug ring activities.

■ The rereading of testimony which the jury does not specifically request is within the trial court's discretion. *See* Standards for Criminal Justice Standard 15–4.2 (2d ed. Supp.1986). That provision reads, in pertinent part:

Jury Request to Review Evidence

(b) The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but *in its discretion* the court may also have the jury review other evidence relating to the same factual evidence so as not to give undue prominence to the evidence requested.

(emphasis added).

■ In light of this standard and the accompanying case law, the trial court did not abuse its discretion when it reread Andrew's testimony about the "thousand quarters." *See United States v. Gentile*, 525 F.2d 252 (2d Cir.1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976). The trial court in *Gentile* replayed three tapes containing incriminating evidence, although the jury had only requested that two tapes be replayed. In reviewing the trial court's actions, the United States Court of Appeals for the Second Circuit stated that

reversal for submitting material in addition to that requested is required only where the submission might indicate, ... prejudice of the judge against the defendant, as, e.g., when the judge insisted on submitting evidence favorable to the prosecution that was in no way germane to the request, or when it leads to a biasing of the record.

525 F.2d at 261.

The *Gentile* court found that the trial judge did not abuse his discretion because the extra evidence he replayed was closely related to the evidence that the jury requested. This is also true in the present case. As the trial judge indicated, Andrew's delivery of a thousand quarters occurred at the same location and within the same time frame as his delivery of raw heroin to Melvin.

■ We also note that any error which the trial court committed in rereading Andrew's testimony was harmless beyond a reasonable doubt, for two reasons. First, the judge gave a cautionary instruction prior to rereading the testimony. He told the jurors that they must decide the case on all the evidence, not only that which they were about to hear. Also, the jury initially requested a transcript of Andrew's entire testimony; had the court complied with this request, the jury would certainly have reviewed the testimony regarding the thousand quarters.

### B. *Rubin Parker*

Rubin Parker was charged with two pairs of possession and distribution offenses: possession of heroin with intent to distribute in May, 1984 (Count 32) and distribution of heroin in May, 1984 (Count 33), as well as possession and distribution in June, 1984 (Counts 34 and 35, respectively). The government stipulated that in each possession/distribution charge, the same

heroin was involved. The jury convicted Rubin on all four counts. In attacking his convictions, Rubin argues that the dual charges were improper, because possession and distribution merged into a single distribution offense in both May and June; according to Rubin, Count 32 merged into Count 33, and Count 34 merged into Count 35.

In some instances, an offense of possession with intent to distribute merges into an offense of distribution. The test for determining merger hinges on the distinction between a single act and a continuing offense. When the narcotics involved in the possession and distribution offense are the same, and there is no showing of any break in the continuity from the acquisition of the narcotics to their distribution, there is only one crime: distribution. *See Jordan v. Virginia*, 653 F.2d 870 (4th Cir. 1980).

Rubin asserts that the evidence is insufficient to support the pair of possession/distribution offenses. He argues that there is no evidence that he possessed heroin in May, 1984, or that he distributed heroin in June, 1984. We do not agree. Although the evidence is not overwhelming, the testimony of several witnesses indicates that Rubin was guilty of separate offenses in both May and June. Andrew testified that he and Rubin began "bagging" heroin (diluting it with benita and quinine) at the stash house before transporting it to Melvin in the spring of 1984. Andrew and Rubin were in joint possession of the heroin when they bagged it at the stash house. Rubin then distributed the heroin when he and Andrew transported it to Melvin. Rubin's possession of the heroin, then, was separate from his transfer of the heroin to Melvin so that it could be sold by the street lieutenants. *Cf. United States v. Atkinson*, 512 F.2d 1235, 1240 (4th Cir.1975) (because there was no showing that defendant possessed the narcotics apart from evidence that he transferred the narcotics pursuant to sale, offenses of possession and distribution merged).

The convictions on the June, 1984 possession/distribution offenses are a bit more troubling. At trial, the government produced no direct evidence that Rubin distributed heroin in June, 1984. The testimony of two witnesses, however, suggests that Rubin did distribute the narcotics at that time. Clarence Meredith's girlfriend, Katie Lee, testified that Rubin visited Clarence at least once a week from June, 1984 to November, 1984. On these visits, Rubin made payments to Clarence. Clarence told Katie Lee that Rubin worked for him selling heroin. From this evidence, the jury could have inferred that Rubin paid Clarence for heroin which Rubin obtained from him and sold on the street. Additionally, Andrew testified that Rubin received raw heroin sometime around the summer of 1984. Rubin's possession of the narcotics, combined with his role as a street lieutenant, indicates that he distributed the heroin during May, 1984, and afterwards. Circumstantial evidence, such as the testimony of Katie Lee and Andrew, may be sufficient to sustain a conviction for narcotics distribution. *See United States v. Blackshire*, 538 F.2d 569, 571 (4th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 113, 50 L.Ed.2d 108 (1976).

### C. *Charles Frisby*

Charles Frisby was charged with possession of heroin on July 14, 1985 (Count 54) and distribution of that heroin between July 14, 1985 and July 20, 1985 (Count 55). In keeping with the specific dates in the indictment, the trial judge instructed the jury that in order to convict Frisby on the possession count, it must find that he received the heroin at a ring meeting on Sunday, July 14, 1985. The judge also told the jury that in order to convict Frisby on the distribution count, it must find that he distributed that same heroin between July 14 and July 20.

The jury convicted Frisby on both counts. The trial court denied Frisby's motion for a judgment of acquittal. On appeal, Frisby argues that the evidence was insufficient to support his conviction, chiefly because the government did not prove that he obtained heroin on July 14. Viewing the evidence in the light most favorable to the

prosecution, we think the trial court properly denied Frisby's motion for a judgment of acquittal. *See United States v. Shaver*, 651 F.2d 236, 238 (4th Cir.1981).

The testimony at trial indicated that Frisby had obtained heroin at ring meetings until he was cut off from the distribution chain sometime in the summer of 1985. Andrew testified that Frisby had regularly attended the ring meetings, usually held on Wednesdays and Saturdays. According to Lawrence's testimony, Clarence stopped giving Frisby heroin immediately after Wiggins was arrested on Monday, July 15, 1985. Another witness, however, stated that Frisby had stopped attending meetings at which heroin was distributed before Wiggins' arrest.

In addition to hearing this conflicting testimony, the jury heard a tape of a conversation between Frisby, Wiggins and Hicks that occurred on Saturday, July 20, 1985. By all accounts, this is the critical evidence as to Frisby's attendance at the July 14 meeting. On July 20, Frisby, Wiggins and Hicks talked together as they waited for the rest of the ring members, who never arrived. Wiggins had been arrested just five days earlier. He was wearing a recording device, which picked up the conversation.

During their conversation, the three men expressed surprise that Clarence and his followers did not appear. They speculated as to why Clarence was not at the appointed meeting place. The court prepared a transcript of their conversation from Wiggins' tape:

> Hicks: Damn, man, I can't be fucking around out here. (inaudible)
>
> Frisby: He didn't say nowhere else, and I was here (inaudible)
>
> Wiggins: Normally, when he change spots, he'll say up there, there, you know.
>
> Hicks: Well, I just took for granted they were right here that's why I came.
>
> Frisby: I ain't took no granted cause that's what he told us when gave us out joints.

The crucial part of this conversation is Frisby's statement "I was here," followed by some unintelligible words. Presumably, Frisby meant "I know the spot for this Saturday meeting because I was here (at an earlier meeting), when Clarence gave out the joints and set up the Saturday meeting." The important question is when "here" refers to: did Frisby mean he was at the July 14 meeting where he received the joints, or at a meeting on another date?

The trial judge could not answer this question when he listened to the tape. In preparing the transcript, the judge redacted the language which he could not understand from the tape. He replaced the unintelligible language with the word "inaudible." Frisby now attacks this redaction. He points out that the government, in its rebuttal argument, called this conversation the "most telling" evidence against him. The government argued that Frisby's statement "I was here" indicated that Frisby was at the regular meeting spot on July 14, when Clarence gave out the joints and set up the July 20 meeting. Frisby quarrels with the government's interpretation of his statement. According to Frisby, the redacted part of the transcript should read "Wednesday. He say Wednesday, that's what he say." Frisby maintains that he referred to the Wednesday, July 17 meeting, and that he knew the spot of the Saturday meeting because Clarence told him about it during the Wednesday meeting. Frisby now argues that the trial court committed prejudicial error in allowing the jury to read the redacted transcript and to infer from it that Frisby had attended the Sunday, July 14 meeting. Frisby asserts that without the transcript of his conversation with Hicks and Wiggins, there is no evidence to indicate that he obtained heroin at the July 14 meeting.

It may be true that the taped conversation contains the most persuasive evidence placing Frisby at the July 14 meeting. Yet, we do not think that the trial court committed prejudicial error in allowing the jury to see the redacted transcript of that conversation. More than once, we have recognized that the use of transcripts in helping a jury to listen to a tape is within the trial court's discretion. *See, e.g., Unit-*

ed States v. West, 574 F.2d 1131, 1138 (4th Cir.1978); United States v. Hall, 342 F.2d 849, 853 (4th Cir.), cert. denied, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965). In this case, the trial judge properly exercised his discretion in offering the transcript as a listening aid. The jury both read the transcript and heard the tape. The trial court specifically instructed the jury that the tape and not the transcript was in evidence, and that the transcript was only to be used as a guide in following the tape. He also told the jurors that their understanding of the tape, rather than the transcript, was to govern their deliberations. The jurors, with these instructions in mind, listened to the tape, including the statement that Frisby allegedly made regarding the Wednesday meeting. Any error in the redaction of the transcript, then, was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### D. Steve Garland

Steve Garland, the proprietor of Modern Music House, attacks the jury verdict against him on both substantive and procedural grounds. He claims that the evidence was insufficient to sustain his conspiracy conviction under Count 2. He also asserts that the trial court improperly admitted co-conspirators' out-of-court statements against him. Finally, Garland challenges the propriety of the government's rebuttal argument. We find all of his challenges to be without merit.

 The elements necessary to support a conspiracy conviction include an agreement among the defendants to do something which the law prohibits; knowing and willing participation by the defendants in the agreement; and an overt act by the defendants in furtherance of the purpose of the agreement. See United States v. Norris, 749 F.2d 1116, 1121 (4th Cir. 1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985). Knowledge and participation in the conspiracy may be proved by circumstantial evidence. Id. Under these criteria, Garland's contacts with the other defendants indicates that he was a part of the heroin conspiracy.

The evidence clearly shows an agreement by the ring members to distribute heroin in violation of 21 U.S.C. § 846 (1982). Garland participated in this agreement by selling, to Clarence and his followers, materials used in the cutting and preparation of raw heroin, such as mannitol, benita, and glassine bags. The evidence indicates that Garland committed this overt act knowingly and willingly, despite his testimony at trial that he did not know he was selling materials to members of a drug ring. For example, Lawrence testified that Garland only sold him benita when Lawrence used a code phrase, and that Garland got the benita from a back room, rather than displaying it in the front of the store. An Internal Revenue Service investigator corroborated this testimony; when the investigator produced a search warrant, Garland told him that the mannitol was stored in a back room. Lawrence also stated that Garland offered him quinine, a cutting agent for heroin. According to Lawrence and his brother Andrew, Garland pocketed the money he received from them, rather than placing it in the shop's cash register. This evidence, coupled with the fact that Garland's sales of cutting agents and glassine bags increased as the ring's narcotics sales increased, was sufficient to show that Garland was a knowing and willing participant in the heroin conspiracy.

 Our conclusion also disposes of Garland's contention that the trial court improperly admitted co-conspirators' out of court statements against him. The trial court, in its discretion, may admit such statements into evidence prior to proof of conspiracy, contingent upon a later showing of conspiracy by independent evidence. See United States v. McCormick, 565 F.2d 286, 289 n. 5 (4th Cir.1977), cert. denied, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978). The evidence recited above, including the testimony of the Internal Revenue Service investigator, Lawrence, and Andrew, served as independent proof of Garland's part in the conspiracy, justifying the

admission of co-conspirators' statements against Garland.

Moreover, we observe that the trial judge, prior to admitting the co-conspirators' statements, required that the government make a proffer regarding the various defendants' participation in the conspiracy. The government proferred a statement of facts contained in its consolidated response to the defendants' pretrial motions, as well as its statements responding to Garland's specific pretrial motions. The judge accepted this proffer. Before admitting the co-conspirators' statements, the trial judge also instructed the jury that the statements were admissible only against the persons making them or against anyone who was proven beyond a reasonable doubt to be a member of the conspiracy.

 Garland also attacks a portion of the government's rebuttal, in which the prosecutor made a comment about the possible leniency of Garland's sentence. The prosecutor stated:

> With regard to Mr. Garland's plea that you leave his fate to some other jury; let it be decided on some other charges at some other time, I submit to you that there is a place in the federal criminal justice system for mercy, but that is not your responsibility. You don't have to go home and feel guilty about what you did. You are not responsible. You didn't create the evidence. You are only asked to say what does the evidence prove. If Mr. Garland is convicted, as I submit the evidence requires, Judge Miller can sentence him to probation. He can give him a fine—

At this point, defense counsel objected, stating:

> Your Honor, I have to object to what your Honor can sentence him. He is well aware that Mr. Garland is facing 15

years, and we don't know what the court will do.

The trial court overruled the objection:

> Well, as I will instruct the jury, they are not to consider punishment. Punishment is the function of the court. Objection overruled.

Unquestionably, comments such as those the prosecutor made about the defendant's possible sentence, standing alone, are improper and may warrant a reversal. *See United States v. Greer*, 620 F.2d 1383, 1384–85 (10th Cir.1980). The jury must reach its verdict without considering possible sentences; a suggestion that a defendant may receive a light sentence may make the jury willing to convict on weaker evidence than it would otherwise require. *Id.*

 Other factors, however, indicate that a reversal is not warranted in this case. As shown above, the trial judge gave a curative instruction immediately after defense counsel objected to the prosecutor's remarks. While this instruction would have been more forceful had the court sustained the objection, it nevertheless indicated to the jurors that prospective punishment was irrelevant to their decision. Additionally, defense counsel appears to have invited the prosecutor's comment by his own remarks. Defense counsel argued that, even if Garland may be prosecuted under Maryland law, that does not imply that he should be prosecuted under federal law; counsel stressed that Maryland law would subject Garland to only light penalties.[4]

When defense counsel opens the door in this way, we allow the prosecutor broad latitude in response. *See, e.g., United States v. Harrison*, 716 F.2d 1050, 1051 (4th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984). The prosecutor's remark about Garland's sen-

---

4. Defense counsel stated that:
> I suggest, if Mr. Garland goes out tomorrow, or anyone in this courtroom who heard what went on, and sells mannital [sic] or bags, they then would be guilty of conspiracy. And that is just what the Maryland law said. It was introduced by the government; and, the fact that Mr. Garland may very well or can very

> well be prosecuted under the state law does not change the federal conspiracy law. The Maryland law even gives the person a break. If they are told what is being done; they are arrested for it and convicted for it, it is a five hundred dollar misdemeanor. If they do it again, they go to jail.

tence, then, does not constitute reversible error.

For the foregoing reasons, the convictions of all seven defendants are

AFFIRMED.