40 F.3d 1244
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry GAINES, Defendant-Appellant.
 No. 93-5507.
 United States Court of Appeals, Fourth Circuit.
 Submitted May 3, 1994.
Decided Nov. 15, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore, No. CR-92-416; Herbert N. Maletz, Senior Judge, sitting by designation.
 Jeffrey C. Hines, Baltimore, MD, for appellant.
 Lynne A. Battaglia, U.S. Atty., Joyce K. McDonald, Asst. U.S. Atty., Baltimore, MD, for appellee.
 D.Md.
 AFFIRMED.
 Before WILKINSON and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 A jury convicted Larry Gaines on three counts related to a conspiracy to steal a tractor-trailer load of imported whiskey and transport it from Maryland to Pennsylvania. Gaines appeals, claiming the evidence was insufficient to support his conviction and that the court improperly admitted certain out-of-court statements and excluded others. Finding these claims lack merit, we affirm.
 
 
 2
 According to the government's evidence, based substantially on the testimony of Frank Suber, the following events transpired. On February 1, 1992, Gaines and Otis Harris went to Ringer Trucking Company in Baltimore, Maryland, looking for something to steal. Through paperwork found in the mailbox, they learned there was a shipment of imported whiskey in a trailer parked on the lot. Gaines called Suber and told him about the trailer of whiskey. The next day, Suber, Gaines, Harris, and Willie Nettles decided to steal the trailer of whiskey.
 
 
 3
 Gaines did not accompany the three others that evening when they went to steal the tractor-trailer. After Suber, Harris, and Nettles used a hot-wired tractor to pull the trailer from the lot, Gaines participated in the discussion of how to dispose of the whiskey. Gaines called a friend of his, Christopher Wright, who dealt on a regular basis in stolen merchandise. The four men met Wright then drove to the business of another of Gaines's friends to try to borrow a truck. Gaines spoke to his friend but could not convince him to part with the truck. They drove to a package store where the proprietor said he would be interested in some of the stolen liquor. Afterwards, Gaines provided a hammer to try to break the customs seal and pin lock on the trailer. Suber and Harris tried unsuccessfully to break open the trailer.
 
 
 4
 The five men decided to move the trailer to Pennsylvania as it would soon be reported as missing. Wright, accompanied by Gaines and Nettles, led the way in his minivan. Harris drove the tractor-trailer and Suber rode with him. The caravan proceeded north on I-83 looking for a place to hide the trailer of stolen whiskey. The minivan and truck stopped twice and Gaines walked back to the truck to ask if Harris and Suber had seen a suitable location.
 
 
 5
 The five eventually settled on a park and ride lot near Glen Rock, Pennsylvania. Gaines tried to open the trailer with a crow bar, but could not break the pin lock. Harris and Nettles drove the tractor back to Maryland, leaving the trailer at the park and ride. Gaines, Wright, and Suber drove the minivan back. On the trip home, Gaines suggested they stop in Pennsylvania, where he looked in a pick-up truck and a few cars for some kind of tool to open the trailer.
 
 
 6
 The next day, Suber and Wright rented a truck to unload the liquor from the trailer. Although Gaines refused to go back to Pennsylvania to unload the trailer because he was nervous, he gave Harris and Suber a set of bolt cutters to open the pin lock on the trailer. Harris and Suber returned to the park and ride and cut the pin lock on the trailer with the bolt cutters. As they began to unload the trailer, the Pennsylvania State Police drove up. Suber fled and eluded capture, but Harris was detained. Harris made a valiant effort at a cover story, claiming that he was unloading the trailer for his employer.
 
 
 7
 After telephone calls by the police yielded less than satisfactory confirmation of Harris's story, they decided to impound the liquor, but not Harris. Harris was released and drove back to Maryland in the rented truck. Shortly thereafter, a "Howard Smith" called the Pennsylvania State Police to inquire about the whiskey. The telephone toll records of the apartment where Nettles and Gaines were staying show one call to the Pennsylvania State Police that night. When Suber called Gaines later, Gaines told him he had "taken care of it."
 
 
 8
 The following day, the five conspirators decided that because Harris and Wright were implicated by direct evidence, Harris and Wright would admit responsibility and the others would deny any knowledge of the events surrounding the heist. Harris was arrested shortly thereafter and charged with the theft of the liquor. Suber was arrested three weeks later on an unrelated outstanding warrant for theft charges in Pennsylvania. Suber was held on this charge along with his accomplice, Ronald Quick. Suber told Quick about the failed attempt to steal the shipment of whiskey. When the FBI questioned Suber about the Whiskey, he denied any knowledge of it.
 
 
 9
 Quick agreed to become an informant for the FBI and pursuant to that agreement, he wore a recording and transmitting device during a conversation with Suber about the whiskey shipment. During the course of that conversation, Suber related essentially the same story of the theft of the liquor as in his testimony at trial. Later that day, Quick, while once again wearing the electronic surveillance equipment, spoke to Nettles and Gaines. In the conversation, both Nettles and Gaines denied involvement in the theft.
 
 
 10
 At trial, because Suber provided the bulk of the government's evidence against Gaines, defense counsel cross-examined Suber and accused him of fabricating his story after negotiating a favorable plea bargain with the government. The prosecution offered the tape made with Quick as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B). The court admitted the tape of the statement.
 
 
 11
 Gaines also took the stand and denied involvement in the crime, claiming essentially to be along for the ride only and not involved in the conspiracy to steal the whiskey. Specifically, Gaines testified that he had persuaded Harris not to steal the trailer the first night they went to Ringer Trucking, tore up the paperwork for the whiskey so no one would have access to it, and went to Pennsylvania only to do drugs. Gaines denied telephoning Suber about the trailer, trying to break into the trailer, trying to borrow a truck and calling the Pennsylvania Police about the trailer. Gaines admitted that he initially called Wright, but testified that he called Wright back after the conversation about the trailer and told him "hey, man, don't do that."
 
 
 12
 After an effective cross-examination, defense counsel offered into evidence under Fed.R.Evid. 801(d)(1)(B), the tape of the conversation between the Defendant and Quick where Gaines denied involvement in the conspiracy. After argument at the bench, the court declined to admit the taped statement. The defense counsel also offered the statement of Nettles, recorded at the same time as the statement of a co-conspirator under Fed.R.Evid. 801(d)(2)(E). The court decided that Nettles's statement was also inadmissible hearsay and excluded it as well.
 
 
 13
 The jury convicted Gaines and the court sentenced him to thirty months on each count to run concurrently. Gaines timely noted his appeal and made a motion to submit the case on the briefs with the Appellee's consent.
 
 
 14
 Gaines raises four issues on appeal. First, he challenges the sufficiency of the evidence against him. In considering Gaines's claim that his conviction is not supported by sufficient evidence, this Court must consider the evidence in the light most favorable to the government and ask whether any rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Vogt, 910 F.2d 1184, 1193 (4th Cir.1990), cert. denied, 498 U.S. 1083 (1991). Gaines challenges the sufficiency of the evidence needed to convict him of the conspiracy, a violation of 18 U.S.C. Sec. 371 (1988). The elements necessary to support a conspiracy conviction are: (1) an agreement among the defendants to commit a crime; knowing and willing participation by the defendants in the agreement; and (2) an overt act by the defendants in furtherance of the agreement. United States v. Meredith, 824 F.2d 1418, 1428 (4th Cir.), cert. denied, 484 U.S. 969 (1987).
 
 
 15
 A defendant need not know all the details of a conspiracy. United States v. Roberts, 881 F.2d 95, 101 (4th Cir.1989). If he "joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy" despite his minor role. Id. "[T]here need only be a showing that the defendant knew of the conspiracy's purpose and some action indicating his participation." United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir.1984), cert. denied, 469 U.S. 1105 (1985). Considering the evidence in a light most favorable to the government, there is sufficient evidence for a conviction on the conspiracy count.
 
 
 16
 According to Suber's testimony, and in some instances, Gaines's own testimony, Gaines read and understood the paperwork regarding the liquor shipment, participated in discussions with co-conspirators concerning the liquor shipment, and contacted Wright, a potential fence. Gaines also tried to borrow a truck to transport the liquor, helped Wright find a buyer, participated in the decision to move the trailer to Pennsylvania, and followed the trailer on the trip. Finally, Gaines tried unsuccessfully to open the trailer, and provided the boltcutters which eventually severed the pin lock. Most of these actions standing alone would show that Gaines knew of the conspiracy's purpose. Each of the actions is enough to demonstrate his participation. Therefore, these actions considered in concert, are more than enough to permit a rational finder of fact to reach the conclusion that Gaines's activities satisfied the three elements necessary for a conspiracy conviction.
 
 
 17
 Gaines also contends that Suber's testimony is not sufficiently credible to sustain a conviction. The credibility of witnesses is within the sole province of the jury and is not susceptible to appellate review. United States v. Saunders, 886 F.2d 56 (4th Cir.1989). This Court will not disturb the jury's finding that Suber was a credible witness.
 
 
 18
 The remaining three challenges are to the district court's evidentiary rulings concerning the admission of taped statements obtained by the FBI through the use of a hidden microphone on Quick. Each challenge is grounded in Fed.R.Evid. 801(d) regarding "non-hearsay hearsay." Quick's first recorded conversation was with Suber and was broadly incriminating of Suber and Gaines. The district court admitted a tape of this conversation. The second tape made by the FBI through the microphone on Quick was with Gaines and Nettles. This tape featured both Gaines and Nettles denying that Gaines was involved. The district court declined to admit this tape. A district court's evidentiary rulings should not be disturbed absent a "clear abuse of discretion." United States v. Blevins, 960 F.2d 1252, 1255 (4th Cir.1992) (applying abuse of discretion standard to admission of hearsay evidence).
 
 
 19
 First, Gaines challenges the district court's ruling allowing the government to admit Suber's prior consistent statement under Rule 801(d)(1)(B). Gaines argues primarily that Suber made the prior consistent statement after he had a motive to lie. Rule 801(d)(1)(B) is designed to allow rehabilitation of a witness with a prior consistent statement after the witness has been impeached. Here, defense counsel impeached Suber, charging that he had fabricated his story implicating Gaines only after he received a favorable plea bargain. This implication opened the door for the government's offer of a prior consistent statement by Suber refuting the allegation.
 
 
 20
 A prior consistent statement under 801(d)(1)(B) is admissible only if the statement was made before the declarant had a motive to falsify. United States v. Henderson, 717 F.2d 135, 138 (4th Cir.1983), cert. denied, 465 U.S. 1009 (1984). Gaines contends that because Suber knew he was under investigation by the FBI in connection with the stolen shipment of scotch and had lied to the FBI, he had a motive to lie to Quick when they were discussing the events surrounding the heist and implicate Gaines. Gaines also contends that it is "highly probable" that somehow before the taped conversation, Quick was able to inform Suber that he was wearing a wire. According to Gaines, Suber then concocted a new story which implicated Gaines in order to cut favorable plea bargains for Quick and Suber. The government argues that Suber already had a motive to lie to the FBI, but had no motive to fabricate a story to Quick about the theft. Suber made his statement before he entered any kind of plea agreement.
 
 
 21
 A district court may distinguish between the time of a declarant's investigation and arrest and his plea bargain in determining when the motive to fabricate arose. Henderson, 717 F.2d at 139. Suber's motive to fabricate in this instance did not necessarily arise immediately when the FBI questioned him. Suber easily could have believed that Quick was merely interested in hearing the story about the stolen whiskey again. The fact that Suber implicated himself in the conversation with Quick also makes it unlikely that he already had a motive to fabricate his statement to Quick. It certainly was not an abuse of the court's discretion to discount Gaines's far-fetched story and conclude that Suber's only motive to fabricate at the time of the statement applied to Suber's statements to the government and not to his friend, Quick. There being no motive for Suber to falsify his statement to Quick and the defense having impeached Suber with evidence of Suber's plea bargain, the district court properly admitted the tape.
 
 
 22
 Gaines's next contention also concerns a prior consistent statement offered under 801(d)(1)(B). This statement was a tape of Gaines's own conversation with Quick who was again wearing electronic surveillance equipment. Nettles, a co-conspirator, was also present and participated in the conversation. Defense counsel offered the statement by Gaines to rebut the government's implication that Gaines had recently fabricated his account of the days in question. The district court ruled the statement inadmissible.
 
 
 23
 Gaines argues that he had no motive to lie at the time of the recorded conversation. He contends that because the FBI had not questioned him, there were as yet no facts linking him to the crime, and as he did not believe he had committed any offense, he had no motive to fabricate his statement. However, after the Pennsylvania police detained Harris, the conspirators decided they would let Harris and Wright take the blame because the police only had evidence connecting the crime to those two. They planned for the remaining conspirators to deny any and all involvement. This alone provided Gaines with incentive to lie to Quick and anyone else. Again, a determination that Gaines had a motive to fabricate at the time he made the statement to Quick would not be based on erroneous factual premises. James v. Jacobsen, 6 F.3d 233, 239. Accordingly, it was not an abuse of discretion for the district court to exclude the evidence.
 
 
 24
 Gaines's final assignment of error is that the statements by Nettles in that same conversation should have been admitted under Fed.R.Evid. 801(d)(2)(E). This Rule allows the statements of co-conspirators made in furtherance of the conspiracy to be admitted into evidence. Fed.R.Evid. 801(d)(2)(E). Gaines offered Nettles's statement to Quick because Nettles maintained that Gaines was not involved in the theft. The district court excluded this statement as well.
 
 
 25
 To admit evidence as a co-conspirator's statement, a court must conclude that (1) there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought and (2) the statements at issue were made during the course of and in furtherance of that conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987). Any findings of fact with respect to these questions are subject to a clearly erroneous standard of review. Id. at 181. In this case, Nettles made his statement to Quick after the end of the conspiracy. The last physical action of any of the conspirators in furtherance of the conspiracy and each of the charges listed on the indictment occurred seven weeks before Nettles's statement. The stolen liquor had been returned to its rightful owners three weeks before the statement. The first co-conspirator was arrested several weeks earlier. Finally, in the recorded conversation Gaines and Nettles were only attempting to conceal their individual roles in the conspiracy rather than trying to further the conspiracy by concealment of the means of its operation. Considering these facts, it would not have been clearly erroneous for the district court to decide that the conspiracy was concluded for the purposes of the admission of Nettles's statement.* It was not an abuse of discretion for the district court to exclude the statement as hearsay not within the exception of 801(d)(2)(E).
 
 
 26
 In the case against Gaines, the evidence was sufficient to support his conviction for conspiracy. Further, the district court did not abuse its discretion in its evidentiary rulings concerning the taped conversations obtained by the FBI. For the foregoing reasons the conviction and judgment are affirmed. We grant Appellant's motion to submit on the briefs because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 
 27
 AFFIRMED.
 
 
 
 *
 The government made Nettles available to testify during the trial and the court expressed its willingness to use its subpoena power to make Nettles available. Notwithstanding this, Gaines did not call nor attempt to call Nettles as a witness