FILED: June 8, 2010

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 01-4308
(CR-00-87)

United States of America,

Plaintiff - Appellee,

v.

Michael Earl Crews,

Defendant - Appellant.

O R D E R

Upon consideration of the request filed to seal/modify the opinion, the Court grants the request. The opinion filed January 23, 2002, is modified by replacing the name of the victim with the word "victim."

For the Court

/s/ Patricia S. Connor

Clerk

UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                    No. 01-4308

MICHAEL EARL CREWS,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CR-00-87)

Argued: December 6, 2001

Decided: January 23, 2002

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion. Judge Motz wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Richard Brooks Glazier, BEAVER, HOLT, STERN-LICHT, GLAZIER, CARLIN, BRITTON & COURIE, P.A., Fayetteville, North Carolina, for Appellant. Thomas B. Murphy, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** H. Gerald Beaver, BEAVER, HOLT, STERNLICHT, GLAZIER, CARLIN, BRITTON & COURIE, P.A., Fayetteville, North Carolina, for Appellant. John Stuart Bruce, United States Attorney,

Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Michael Crews was convicted of producing and conspiring to produce child pornography, in violation of 18 U.S.C. §§ 2251(a) & 2251(d). Challenging his convictions on appeal, Crews contends that the government's evidence was insufficient to prove (1) the existence of an agreement as an essential element of conspiracy and (2) the fact that the visual depictions at issue moved in interstate commerce. He also contends that the district court admitted evidence in violation of Federal Rule of Evidence 404(b). Finally, he challenges the delayed search of his impounded automobile under the Fourth Amendment. For the reasons that follow, we affirm.

I

The 14-year-old victim in this case, who obtained from friends the telephone number of Michael Crews, called Crews and spoke to both Crews and his roommate, Julius Schlee. During the conversation, he told Crews and Schlee that he was 14 years old. At the time, Crews and Schlee were about 25 years old and lived in an apartment in Fayetteville, North Carolina. Pursuant to arrangements made during the call, Crews and Schlee picked the victim up at his home the next morning around 8:00 a.m., after the victim's parents had left for work, and they took him back to their apartment. At the apartment, the three watched a male pornographic video and then went to a bedroom where all three took off their clothing and engaged in sexual acts. When they were finished, Schlee showed the victim pictures on his computer of "guys" "performing sex acts." After the three arranged to meet the next day at 7:30 a.m., Crews and Schlee took the victim home.

The following morning, Crews and Schlee again picked the victim up and took him to their apartment. The three played a game of nude Twister and then went into the bedroom where the victim performed anal sex on Crews while Schlee stood by. When they were finished, Crews left the room, and the victim performed anal sex on Schlee. During this encounter, Crews came back into the room, picked up the video camera that was beside the bed and started filming Schlee and the victim. Schlee and the victim asked Crews to stop but Crews said to "hold on," insisting that he wanted to take the video. He continued to film Schlee and the victim for about ten minutes.

Later that same morning, Crews took approximately 15 to 20 nude pictures of Schlee and the victim, using a digital camera that was attached to his computer. A few days later, Crews and Schlee sent images of these pictures via an America Online e-mail account to the victim, which he viewed at his home. After these encounters, the victim never saw Crews again.

A few weeks after the video of Schlee and the victim was taken, Schlee saw Crews watching it and repeatedly asked Crews to destroy the tape. Crews refused, telling Schlee that he would do what he wanted with it.

A year later, Crews moved from North Carolina to Virginia, presumably taking all of his possessions with him. Schlee later testified that to the best of his knowledge, Crews still had possession of the videotape of Schlee and the victim. Indeed, Crews repeatedly threatened Schlee in the manner, "I wonder what your mom would think if she saw these videos."

After the victim's father learned about his minor son's encounters, Crews was indicted in the Eastern District of North Carolina for producing child pornography and aiding and abetting in the production of child pornography, in violation of 18 U.S.C. § 2251(a), and conspiracy to produce child pornography in violation of 18 U.S.C. § 2251(d). Crews was convicted, and the district court sentenced him to 100 months' imprisonment. From the judgment of conviction, Crews filed this appeal.

## II

Crews contends first that the evidence was insufficient to convict him of conspiring to produce child pornography because the government failed to meet its burden of showing an agreement between Crews and Schlee to create the visual depictions at issue in this case.

In order to establish that Crews and Schlee conspired to produce visual depictions of minors engaged in sexual acts, the government must prove, among other things, that they agreed to produce such visual depictions. *United States v. Meredith*, 824 F.2d 1418, 1428 (4th Cir. 1987). The government does not, however, have to show an explicit agreement because "agreement may be inferred from the facts and circumstances of the case," *United States v. Baker*, 985 F.2d 1245, 1255 (4th Cir. 1993), and "a tacit or mutual understanding among or between the parties will suffice," *United States v. Depew*, 932 F.2d 324, 326 (4th Cir. 1991). To meet its burden of proof on a particular issue, the government must present substantial evidence sufficient to support the jury's verdict. *See Glasser v. United States*, 315 U.S. 60, 80 (1942) (holding that a jury verdict must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it").

In this case, there was ample evidence from which the jury could have inferred that Crews and Schlee agreed to produce the visual depictions at issue. The initial encounter between Crews, Schlee, and the victim was orchestrated to the point that within an hour of meeting, the three were in the bedroom performing sex acts. In addition, Schlee was aware that Crews had, in the past, made a sexually explicit video of himself with a young boy; the video camera used to take the video in this case was sitting right next to the bed; and after Schlee and the victim's initial protest, Crews videotaped Schlee and the victim engaging in sex acts, without further protest, for ten minutes. Taking this evidence in the light most favorable to the government, it was sufficiently substantial to support the jury's finding of an implied agreement to produce pornography.

## III

Crews also contends that there was insufficient evidence from which the jury could have found that the visual depictions at issue in

this case were "actually . . . transported in interstate . . . commerce." 18 U.S.C. § 2251(a). We conclude there was ample evidence from which the jury could have concluded that the videotape in question was taken by Crews from North Carolina to Virginia when he moved to Virginia, and, therefore, this element was sufficiently proven by the government. Schlee testified that Crews moved to Virginia and as far as he knew took all of his belongings with him. Moreover, Crews implied that he had the videotape in his possession because (1) despite Schlee's repeated requests, Crews refused to destroy the videotape and (2) after moving to Virginia, Crews threatened Schlee with playing the tape for Schlee's mother. From this evidence, the jury could have concluded that Crews transported the videotape from North Carolina to Virginia.

IV

Crews next contends that the district court erred in admitting testimony about an earlier videotape that Crews took involving a sexual encounter between himself and another boy. He asserts that the district court admitted this evidence in violation of Federal Rule of Evidence 404(b) because the evidence was irrelevant to any of the charged crimes and any probative value the videotape may have had was substantially outweighed by its prejudicial effect. We find this argument to be without merit. This videotape of a prior encounter with someone other than the victim supported an inference that Crews and Schlee planned to create a videotape of the encounter between the two of them and the victim because Schlee's testimony about both the contents of this tape and his knowledge that Crews had made it could be taken as circumstantial evidence demonstrating a tacit agreement between the two men to create a similar videotape with the victim.

In addition, the district court admitted evidence about the existence of this videotape but did not permit the jury to view it, thereby avoiding much of the prejudice that might have been caused had it been shown to the jury. We therefore conclude the district court did not abuse its discretion.

V

Finally, Crews challenges the admission of an address book into evidence, contending that the address book was obtained through a

search of his automobile, in violation of the Fourth Amendment, and therefore should have been suppressed.

Crews' automobile was searched and impounded in October 2000 pursuant to his arrest on state law charges. As part of its investigation of Crews for federal crimes, the FBI performed an additional search of the vehicle in late July 2001 and discovered the address book at issue. At the time of the search, the automobile was still being held in the impound lot, and the FBI agent believed that the vehicle had been abandoned and now belonged to the impound lot. Accordingly, he obtained permission from the lot's owner to search it.

According to Virginia law, under which the automobile was impounded, an owner who fails to reclaim an impounded abandoned car within 15 days consents to the sale of the vehicle at public auction by the entity holding the car. *See* Va. Code Ann. § 46.2-1202. The FBI agent also testified that in Virginia, a vehicle seized by the police department is turned over to a contractor station which maintains the vehicle for 30 to 60 days, during which it must make all reasonable attempts to return the vehicle. If the vehicle is not reclaimed by its owner during that period, it becomes the property of the station to do with what it wishes.

The automobile at issue in this case was held by the impound lot for almost ten months before the FBI performed its search of it. Thus, by the time the search was conducted, the vehicle had become property of the impound lot, and Crews no longer had "a legitimate expectation of privacy in the vehicle." *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (holding that when a person no longer has an expectation of privacy in a vehicle, he lacks standing to challenge a search of the vehicle). Accordingly, we conclude that Crews' constitutional rights under the Fourth Amendment were not violated because he lacked standing to challenge the search of the vehicle. Therefore, the district court's admission of the address book into evidence did not constitute an abuse of discretion.

For the reasons given, the judgment of the district court is

*AFFIRMED.*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The Government presented no evidence that the visual depictions at issue in this case — those involving the minor victim — were "actually transported in interstate commerce," as is required in order to violate the provision of the federal child pornography statute under which Crews was indicted. *See* 18 U.S.C.A. § 2251(a) (West 2000). Accordingly, no reasonable jury could have concluded that the depictions had in fact been transported in interstate commerce in violation of that statute. Therefore, with respect, I must dissent from the majority's contrary holding.

Three background facts — all undisputed — are necessary to understand the deficiency in the evidence. First, Crews made all of the depictions of the victim — the videotape and the digital pictures — in North Carolina. JA 338-40, 344. Second, Crews also made in North Carolina two or three other videotapes showing Julius Schlee masturbating, on which the victim did not appear. JA 342. Third, after creating all of these videotapes, Crews later moved to Virginia, and, prior to trial, never again had face to face contact with Schlee. JA 347. With this background in mind, I examine all testimony that could conceivably demonstrate actual interstate transport of the videotape or digital pictures of the victim.

Schlee testified that he repeatedly urged Crews to destroy the videotape of himself and the victim. A "week or two after it was made" (when Crews was clearly still in North Carolina), Schlee saw Crews "watching it on TV"; he "told [Crews] many times, including that time, that he needed to destroy that tape," but Crews refused. JA 341-42. This testimony does not demonstrate that Crews moved to Virginia with the victim's videotape or even that he refused to destroy the victim's videotape after moving to Virginia.

When an investigation into Crews's and Schlee's conduct began, Crews wrote Schlee a letter implying that the tape of the victim and Schlee had been destroyed: "[T]he detectives . . . asked me about a tape. They searched my house for this type [sic] but they never found the tape. As far as anyone is concerned, that evidence against you has been destroyed." JA 373. This letter is silent as to when Crews

destroyed the tape, and thus provides no basis from which to infer that Crews transported it to Virginia.

The only other evidence as to what Crews took to Virginia comes from Schlee's testimony in the following exchanges:

Q: Did the defendant take his computer with him?

A: *I'm assuming* he took everything.

Q: He didn't leave anything behind?

A: Not as far as I know.

Q: As far as you know, he took his collection of child

pornography?

[Objection. Sustained.]

Q: Did he take his computer if you know?

A: *I don't know.*

JA 344. (Emphasis added). This testimony provides no support for a finding that Crews took his computer with him to Virginia, perhaps physically transporting the digital pictures.

After a subsequent discussion of Crews's electronic communications with Schlee after the move, Schlee gave the following testimony:

Q: What did he say to you that you took as threats?

A: Well, he had said that *[the victim]'s mom had been calling him while he was down here or in Fayetteville and asking wanting to know my name and my address down here and everything like that. He said that she continued to contact him when he moved to Virginia. His explanation was he was trying to protect me, so he was*

*keeping quiet about it* but she kept calling him everyday [sic] or something like that . . . . It was like if I wasn't polite to him or nice to him or like that then he would tell [the victim]'s mom everything that had been going on.

Q: Did the defendant at this time, to the best *of your knowledge, still have those videotapes that he made of you*?

A: *Yes, sir.*

Q: Did he *ever use those videotapes to threaten exposure of those videotapes against you*?

A: Well, it's the same way as with [the victim]'s mom thing. He wouldn't come out and say if you don't do this, then I'm going to show these to whoever. But whenever he got in a foul mood, and I wasn't doing like I was supposed to, then he would mention something like *I wonder what your mom would think if she saw these videos or something like that. I confronted him one time about it. He said that the only reason I was hanging around his apartment was because if I left he would send those videos to my mother. . . .*

JA 345-47. (Emphasis added).

Schlee's testimony simply does not support a finding that Crews took the videotape of the victim and Schlee with him when he moved to Virginia. If, after the move to Virginia, Crews had made a specific threat to show the Schlee-victim videotape to the victim's mother or Schlee's mother, a jury might be able to infer that Crews had taken it to Virginia. But there is no such evidence.

Schlee never testified that Crews threatened to show the victim's mother the videotape; instead, Crews simply refused her requests for information about Schlee. Crews did, according to Schlee, threaten to show Schlee's mother some unspecified videotapes, but nothing indi-

cates that these threats were made *after* the move to Virginia; during the only such conversation that Schlee specifically describes, the men were plainly together *in North Carolina*, with Schlee "hanging around [Crews's] apartment." JA 347.

Moreover, the reported threats to show "those videos" to Schlee's mother do not even necessarily refer to the one videotape in which the victim appears, the only one that was a basis for Crews's child pornography convictions. Although Crews made only one videotape in which the victim appears, he made several of Schlee, an adult, masturbating alone. Crews's asserted references to "these videotapes" must include something other than the single Schlee-victim videotape, and might easily mean only the Schlee solo videotapes.* Nor does the information that Schlee would not want his mother to see the videotapes in question point to the Schlee-victim videotape, because Schlee would not have wanted disclosure of any of the videotapes to his mother.

For these reasons, I am forced to conclude that the Government has provided no basis from which a reasonable jury could have found that the visual depictions of the victim charged in the indictment were actually transported in interstate commerce.

---

*Schlee's testimony with regard to his "knowledge" as to Crews's transport of *any* videotapes to Virginia is weak, given that Schlee conceded that he was only "assuming" Crews "took everything" to Virginia. JA 341.